945 A.2d 692

IN RE APPLICATION OF VIRTUA–WEST JERSEY HOSPITAL
VOORHEES FOR A CERTIFICATE OF NEED.

Argued November 27, 2007—Decided April 23, 2008.

414 

*John C. Connell* argued the cause for appellants Cooper Health System and Our Lady of Lourdes Medical Center (*Archer & Greiner,* attorneys; *Mr. Connell* and *Robert J. Fogg,* on the briefs).

*Melissa H. Raksa,* Deputy Attorney General, argued the cause for respondent Department of Health and Senior Services (*Anne Milgram,* Attorney General of New Jersey, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Rachana R. Munshi,* Deputy Attorney General, on the brief).

*Philip H. Lebowitz,* a member of the Pennsylvania bar, argued the cause for intervenor-respondent Virtua–West Jersey Hospital Voorhees (*Duane Morris,* attorneys; *Katherine Benesch,* of counsel; *Mr. Lebowitz* and *Erin M. Duffy,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

Since 1971, New Jersey has employed a regulated process, known as certificate-of-need (CN) review, to supervise changes in the state-wide delivery of health care. *See* Health Care Facilities Planning Act (HCFPA), *N.J.S.A.* 26:2H–1 to –26 (establishing CN system of review under supervision of Commissioner of Health). For more than two decades the CN process facilitated top-down regulatory control over the health care delivery system through the requirements of State identification of health care needs and prior approval for additions or changes to the allocation of health care services among providers. *See N.J.S.A.* 26:2H–7 (controlling proliferation of services declared to be essential for purposes of cost containment and quality maintenance). The CN regulatory system was changed substantially in the late 1990s, however, after a legislatively authorized study scrutinized the continued efficacy of a CN requirement. The CN statute was amended in a number of ways and regulatory changes followed suit. Some health care services became altogether exempt from the requirement of prior approval through a state-issued CN. Other streamlining changes in process were enacted.

Importantly, for purposes of the case before us, the Legislature retained the requirement of full regulatory review and issuance of a CN for many types of health care services. To facilitate the revised CN process, the Department of Health and Human Services (Department) promulgated a regulation, establishing a new, regularized schedule for the submission of full-review CN applications by providers. *See N.J.A.C.* 8:33–4.1. The regulation identifies certain health care categories that are subject to a new CN submission schedule that, generally, calls for CN applications to be submitted on the dates specified for each category of service or type of equipment.[1] *Ibid.* At the same time, however, the regulation frees the Commissioner from any implied finding of need for a service based solely from processing a CN request submitted pursuant to this general invitation for CN applications. *Ibid.* The regulation also does not disturb the Commissioner's discretionary authority to issue special calls for CN applications for discrete health care services when the Commissioner finds a particular need for a service. *Ibid.*

This appeal involves a challenge to a CN that the Commissioner granted to a hospital following the Department's first experience under this new notice system involving annual submission dates and special calls for CN applications, as it applies to maternal and child care health needs. *In re Virtua–West Jersey Hosp. Voorhees,* 390 *N.J.Super.* 444, 455, 915 *A.*2d 1074 (App.Div.2007) (affirming Commissioner's CN grant). The primary issue in this matter is whether the Commissioner provided sufficient notice to the regulated public that providers in the field of maternal and child health care needs could apply for a particular change in status. If sufficient notice was provided, we must further determine whether the agency's record supports the Commissioner's determination to grant the hospital's specific CN application.

---

[1] The category of "maternal and child health care needs" was included in the new scheduled call list. *See N.J.A.C.* 8:33–4.1(a)(2). Applications for such services were scheduled for submission on January 2, 2003, and annually thereafter on the same date. *Ibid.*

For the reasons that follow, we hold that the Department provided sufficient notice. Therefore, the Commissioner's determination to process this CN application is affirmed. However, because we cannot conclude that the Commissioner has performed a complete analysis of the effects of a grant of this CN— specifically in respect of assessing the effect that granting this CN will have on nearby, competing urban-hospital providers—we are compelled to remand this matter to the Commissioner for a more complete examination and explanation for her decision.

I.

In the March 3, 2003, edition of the New Jersey Register, the Department published a notice inviting hospitals to submit "[CN] applications on a full review basis for Maternal and Child Health Consortia change in membership, and for intermediate and intensive bassinets in licensed general hospitals in those . . . regions in which a need has been identified based on the most recent utilization projects." 35 *N.J.R.* 1311(b) (Mar. 3, 2003). Virtua–West Jersey Hospital Voorhees (Virtua), a system of community hospitals located in Voorhees Township, Camden County, submitted a CN application on behalf of its Voorhees hospital. Within the State's system of Maternal and Child Health Consortia, Virtua is a member of the Southern New Jersey Perinatal Cooperative (SNJPC). The SNJPC is a non-profit organization that serves as the maternal and child health consortium responsible for monitoring Virtua's, and other consortium members', perinatal and pediatric needs and services.

Virtua's CN application requested approval to add four intensive bassinets and eight intermediate bassinets to its already approved complement of bassinets. In addition to that request, Virtua applied for a designation change for its Voorhees hospital in respect of maternal and child health services. That request is the focus of this appeal. Specifically, Virtua asked for a change in classification from that of a "Community Perinatal Center–Intensive" to a "Regional Perinatal Center" (RPC). A RPC is a

licensed general acute care hospital servicing "high risk mothers and neonates" and providing "consultation, referral, transport, and follow-up" to other hospitals in a certain geographic region. *See N.J.A.C.* 8:33C–1.2 (defining "RPC").

Because the Department's March 3, 2003, published call notice did not include an explicit reference to a "change in designation," two competitors who already held RPC status, Cooper Health System and Our Lady of Lourdes Medical Center (petitioners), objected to the Department's processing of Virtua's application. Despite the objection, once Department staff determined that Virtua's application was complete for processing purposes, *see N.J.A.C.* 8:33–4.5, the application was forwarded to the State Health Planning Board (SHPB) for review. *See N.J.S.A.* 26:2H–5.8; *see also N.J.A.C.* 8:33–4.1(a), –4.13.

At the time, the only RPC serving the southern New Jersey region was the joint RPC designation shared by petitioners. According to Virtua, it sought its own RPC designation for its Voorhees hospital because

the proximity of the two Camden-based RPCs to Philadelphia has led to competition from the Philadelphia university hospitals for high risk obstetrical and neonatal patients who require transport to an [sic] RPC. Many patients and referring doctors will bypass a Camden facility to continue directly over the bridge to [Philadelphia for care].

The "many patients" migrating out of New Jersey to hospitals in neighboring states included Virtua's own increasing number of high-risk obstetrical and neonatal patients, as well as others in the southern New Jersey region.

Petitioners opposed the designation change through argument and supporting materials submitted to the Department staff evaluating Virtua's application, and to the SHPB. In part, petitioners cited a failure of notice because the Department's March 3, 2003, Register notice did not mention a request for "designation changes." Noting that the Department never studied whether the region needed another RPC, petitioners claimed that approval of Virtua's application would create "a serious and damaging impact on the[ir] existing [joint RPC] in Camden." Based on an assump-

tion that patients would prefer the suburban location of Virtua, petitioners surmised that in the future they would be forced to discontinue services to indigent patients because they would lose paying patients who otherwise would have traveled willingly to the Camden RPC.

Petitioners also claimed that had the Department issued a CN call for changes in RPC designations, they would have been assured of an impact evaluation, examining the effect of adding another RPC in the vicinity of Camden's large, indigent-patient population. That study necessarily would have explored petitioners' related contention that Virtua's policies contributed to the patient out-migration problem because Virtua was sending patients to Wilmington, Delaware and Philadelphia, Pennsylvania, instead of sending them to petitioners.[2] Thus, petitioners' argument—about lack of a proper call for a designation change—raised substantive, as well as procedural issues.

Despite petitioners' objections, Department staff appeared at the SHPB hearing on Virtua's application and recommended its approval. The staff identified a substantial increase in Virtua's own specialty maternity patients who were going out-of-state to give birth, noting that "[o]f the New Jersey residents giving birth out of state in 2002, 55 percent (1,191) came from Virtua's three county service area. In 2001, 28 percent of all out-of-state births came from Virtua's three county service area." The departmental reviewers concluded in favor of approval of the designation change because patient access and care would improve, while out-migration of New Jersey patients would decrease. Virtua's presentation to the SHPB also emphasized the increase in Virtua's maternity patients. It argued that a RPC designation would enable the hospital to serve its own growing patient population, while minimizing out-migration of other patients from southern New Jersey.

---

[2] The record reveals that Virtua has a business relationship with a hospital in Wilmington, Delaware, to which it referred patients.

The SHPB approved the CN application and, on October 5, 2004, the Acting Commissioner of Health and Senior Services (hereinafter Commissioner) issued a final decision approving Virtua's application in its entirety. Petitioners challenged the Commissioner's decision by way of appeal to the Appellate Division, *see* *R.* 2:2–3(a)(2), however, applying general principles of appellate deference to agency actions that are not arbitrary, capricious, or unreasonable, the appellate panel rejected that challenge. *In re Virtua–West, supra,* 390 *N.J.Super.* at 452, 915 *A.*2d 1074. We granted certification to consider the procedural and substantive issues raised by petitioners. 191 *N.J.* 315, 923 *A.*2d 230 (2007).

## II.

Petitioners first contend that the Commissioner should not have processed Virtua's application because the specificity of the Department's March 2003 notice should have precluded an applicant from responding with an application for approval of services unidentified in the CN call notice. In petitioners' view, the Commissioner was duty-bound to reject the application as non-responsive, *see N.J.A.C.* 8:33–4.3(b) (stating Department may declare CN application as unresponsive to departmental notice and unacceptable for processing), because she lacked the authority to accept an unresponsive application.

Petitioners' second argument seeks reversal of the Commissioner's CN grant to Virtua based on a purported lack of adequate support in the record. Petitioners complain that the Commissioner's analysis did not properly account for the impact that a grant of RPC status to Virtua would have on petitioners. They further contend that the Commissioner did not fulfill her duty under the CN statute to protect urban hospitals, a duty that petitioners claim is evidenced in the Legislature's plainly expressed concern about the importance of preserving urban hospitals. *See N.J.S.A.* 26:2H–6.1(h).

Both the Commissioner and Virtua defend the Commissioner's processing of the CN application as being well within the scope of

her lawful authority under the revised system of "call" notice for maternal and child health needs. They further maintain that the record contains substantial credible evidence to support the CN grant to Virtua and that, based on the applicable deferential standard of appellate review, the Commissioner's decision should be affirmed.

We turn first to the claim that the Commissioner erred merely by processing Virtua's CN application for a designation change.

### III.

#### A.

In administrative law, the overarching informative principle guiding appellate review requires that courts defer to the specialized or technical expertise of the agency charged with administration of a regulatory system. *See In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 478, 488–89, 852 *A.*2d 1083 (2004). Consistency with that principle demands that an appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence. *See In re Herrmann,* 192 *N.J.* 19, 28, 926 *A.*2d 350 (2007) (citing *Mazza v. Bd. of Trs.,* 143 *N.J.* 22, 25, 667 *A.*2d 1052 (1995)); *see also Campbell v. Dep't of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963).

When, however, an agency's construction and application of its enabling legislation is part of the appellate challenge, a reviewing court is not "bound by the agency's interpretation of a statute or its determination of a strictly legal issue." *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). That is so because it is the responsibility of a reviewing court to ensure that an agency's administrative actions do not exceed its legislatively conferred powers. That said, the breadth of an agency's authority encompasses all express and implied powers

necessary to fulfill the legislative scheme that the agency has been entrusted to administer. *See Cammarata v. Essex County Park Comm'n,* 26 *N.J.* 404, 411, 140 *A.*2d 397 (1958) ("The grant of an express power is always attended by the incidental authority fairly and reasonably necessary or appropriate to make it effective. Authority delegated to an administrative agency should be construed so as to permit the fullest accomplishment of the legislative intent." (citations omitted)). Thus, administrative agencies are allowed some leeway to permit them to fulfill their assigned responsibilities. In sum then, subject to acting as a check to ensure that an agency does not exceed its statutory authority, a reviewing court should strive to " 'give substantial deference to the interpretation [the] agency gives to a statute that the agency is charged with enforcing.' " *Saint Peter's Univ. Hosp. v. Lacy,* 185 *N.J.* 1, 15, 878 *A.*2d 829 (2005) (quoting *Smith v. Dir., Div. of Taxation,* 108 *N.J.* 19, 25–26, 527 *A.*2d 843 (1987)).

With those guiding principles firmly in mind, we turn to the issues at hand.

### B.

HCFPA provides the statutory framework for the challenge to the Commissioner's actions in this matter. We must consider this complex statute and the purposes behind the legislative changes that have brought the regulatory program to its present form.

When amending HCFPA in 1998, the Legislature called the CN system "the last remaining vestige of [New Jersey's once] highly regulated [health care] environment." *N.J.S.A.* 26:2H–6.1(e). From the outset of the state's adoption of a CN regulatory system, the legislative intent animating HCFPA was plain: to provide state residents with high quality health care services at a contained cost. *See N.J.S.A.* 26:2H–1. In furtherance of that objective, the Legislature mandated that health care facilities and services could not be expanded or instituted without the Commissioner's identification of a need and prior approval of the change through issuance of a CN. *See N.J.S.A.* 26:2H–7. State identifica-

tion of a need was pivotal to maintaining control over competition, proliferation of services, and quality of service.

After a score of years during which the CN system operated essentially as originally enacted, the CN program came under criticism as being slow and unresponsive to market changes. Calls for reform reached the Legislature. Recognizing that, over time, competition had transformed the health care industry and had "exposed the inefficiencies inherent in centralized health care planning, which was unable to respond quickly to the changing needs of the health care system," *N.J.S.A.* 26:2H–6.1(c), (e), the Legislature determined that a close examination of the CN program was warranted. Indeed, the Legislature found itself questioning the very retention of a CN requirement. *See N.J.S.A.* 26:2H–7.9 (repealed 2007).

In 1998, the Certificate of Need Study Commission (CN Commission) was established to examine the continued effectiveness of the CN requirement. *See N.J.S.A.* 26:2H–7.9(a). The Legislature charged the CN Commission to consider deregulation and to assess, among other things, the impact of deregulated facilities or services on urban hospitals, the overall quality of health care delivered, and access to care. *See N.J.S.A.* 26:2H–7.9(b). After a period of review, the Commission recommended retaining a CN requirement, but not for all health care areas. In respect of the health care services for which a continued CN requirement made sense, the CN Commission explained that

[q]uality and volume are closely interrelated.... [A CN], as opposed to licensing standards, is a tool to prevent quality problems in these areas by promoting expansion of services only when a population-based need can be shown, thus assuring sufficient volume to maintain staff skills and program financial viability.

Spurred by the CN Commission's detailed recommendations for changing the then-existent CN requirement, the Legislature amended the CN statute, exempting certain services from a CN requirement, *see N.J.S.A.* 26:2H–7a, –7c, while retaining the requirement in areas where

a limitation of the proliferation of such services [through the CN requirement] may continue to be essential to protect the viability of the services as well as the providers now rendering them, to protect the role of such institutions as urban

hospitals, whose importance to the Statewide health care system is indisputable, and to guard against the closing of important facilities and the transfer of services from facilities in a manner which is harmful to the public interest.
[*N.J.S.A.* 26:2H–6.1(h).]

Significantly, for purposes of the present appeal, the Legislature retained a CN requirement for hospital maternal and child health care services organized through the maternal and child health consortia.[3] *See N.J.S.A.* 26:2H–7; *see also N.J.A.C.* 8:33C–1.1(a), –1.3, –3.4; 33 *N.J.R.* 2618(a) (Aug. 6, 2001).

## C.

To implement the new statutory system, the Department promulgated comprehensive new regulations in 2002 that, among other things, implemented the legislative determination to continue a full-review CN requirement. *See* 34 *N.J.R.* 458(a) (Jan. 22, 2002). The new rules contained several refinements to the CN process, including the establishment of a revised call system. *Ibid.* The Commissioner adopted a new system of notice, devised to aid in the Department's identification of, and responsiveness to, health care industry needs. *See N.J.S.A.* 26:2H–7c, –8. Under the new system, the Commissioner published a generic schedule establishing dates for the submission of CN applications for certain enumerated health care services or equipment. However, the revised regulation preserved the Commissioner's ability to call for CN applications to be submitted any time the Department identified a need for a new or enhanced service in the state or any region thereof.[4] *See N.J.S.A.* 26:2H–7c, –8; *see also N.J.A.C.* 8:33–4.1 (establishing review cycles and submission dates).

---

[3] The Legislature directed retention of a CN requirement applicable to the services organized under the maternal and child health consortia but subjected the requirement to further departmental study and analysis. *See* 33 *N.J.R.* 2618(a) (Aug. 6, 2001). The Department later readopted regulations continuing the CN requirement for maternal and child health care consortia services. *See* 39 *N.J.R.* 829(a) (Mar. 19, 2007). Such services include a hospital's designation as a RPC.

[4] Previously, the CN review process was initiated whenever the Commissioner determined to issue a specific call for applications. *See* 27 *N.J.R.* 4179(a) (Nov.

The schedule lists commonly needed items, such as ventilators, rehabilitation beds, and psychiatric beds, for which applications may be submitted in accordance with the annual submission dates. *N.J.A.C.* 8:33–4.1(a)(2). Pursuant to that regulation, the Department announced that it would accept CN applications for maternal and child health needs on an annual basis, as of January 2, 2003. *See ibid.* The category of maternal and child health needs, by definition, encompasses a variety of services identified in *N.J.A.C.* 8:33C–1.4, including requests for a designation change or an increase in a hospital's quantity of intermediate or intensive care bassinets. *N.J.A.C.* 8:33C–1.4(b)(3) (designation change); *N.J.A.C.* 8:33C–1.4(b)(4) (bassinet increase).

*N.J.A.C.* 8:33–4.1(a)(3) further provides that acceptance of applications submitted in accordance with the review cycles and yearly submission dates set forth in subsection (a)(2) of the regulation would not equate to a departmental finding of need for the additional beds or services proposed in any such submitted CN application. That said, the regulation also permits the Commissioner "[to] announce additional or special calls for certificate of need applications beyond the ones identified in the yearly notice or *[to] delete announced calls from the yearly notice.*" *N.J.A.C.* 8:33–4.1(a) (emphasis added). Such call notices minimally must "identify the needed service(s), proposed geographic area(s) to be served, the date the application is due, and the date the application is deemed complete for processing." *Ibid.*

## IV.

### A.

The notice backdrop to the CN in issue here involves more than simply the March 3, 2003, notice in the New Jersey Register. An

---

6, 1995); *see also* 34 *N.J.R.* 458(a). Although specific calls still may occur, the Department adopted the annual schedule system because the CN Commission found that the older system resulted in unpredictable and irregular calls for CN applications.

analysis of the relevant notice provided by the Department must start with the promulgation of the generic January 2 date for submission of CN applications for services encompassed under the designation of maternal and child health care needs.

After the Department adopted in August 2002 the regulation establishing the annual January 2 date for receipt of applications for services qualifying as maternal and child health care needs, the Department published a subsequent notice in the December 2, 2002, New Jersey Register stating that,

> pursuant to [*N.J.S.A.* 26:2H–7c] and recent certificate of need rule amendments at *N.J.A.C.* 8:33, the certificate of need call for Maternal and Child Health Consortia change in membership and for intermediate and intensive bassinets, originally scheduled to take place on January 2, 2003 in accordance with *N.J.A.C.* 8:33–4.1(a)2 (see 34 *N.J.R.* 2814(a)) is hereby postponed[.]
>
> [*See* 34 *N.J.R.* 4226(a) (Dec. 2, 2002).]

The stated reason for the delay was to allow the Department more time to prepare for its regulatory review and to permit interested and affected parties more time to prepare their submissions in respect of the anticipated CN applications. *See ibid.*

With that notice, the Department informed the public that it was postponing a call for applications for "Maternal and Child Health Consortia change in membership, and for intermediate and intensive bassinets," which would have been subsumed within the general notice permitting submission of applications pertaining to maternal and child health care needs on January 2, 2003, pursuant to *N.J.A.C.* 8:33–4.1(a)(2). *See* 34 *N.J.R.* 2814(a) (Aug. 5, 2002); *see also* 34 *N.J.R.* 4226(a). The Department's specific call, for the narrower band of beds and services, later was rescheduled to May 1, 2003, *see* 35 *N.J.R.* 1311(b), to allow "potential applicants and affected parties sufficient time to respond appropriately." *Ibid.* A notice rescheduling the call provided information about the number of beds for which the Department had identified an existing need, the regions in which the need had been identified (allocating the number of beds by specific regions), and also informed the regulated public that one region of the state was deleted from the

call notice, thereby precluding applications from providers within a specific consortium. *Ibid.*

### B.

The Department argues that none of those more specific notices, by their terms, rescinded the general notice of the Department's willingness to entertain applications for services qualifying as maternal and child health care needs, provided through operation of *N.J.A.C.* 8:33–4.1(a)(2). In light of the series of general and specific notices that occurred, the Commissioner believed that she had the authority to accept for processing Virtua's application for a designation change. Petitioners, on the other hand, argue that the Commissioner was precluded from considering Virtua's application by the specificity of the March 2003 notice, which did not mention designation changes in the call for CN applications.

Based on our review of the regulations, as well as the notices involved here, we cannot accept petitioners' position. Petitioners' demand for more specific notice simply misapprehends the intersection of the scheduled annual call dates for CN submissions with specific calls for CN applications.

### C.

As *N.J.A.C.* 8:33–4.1(a) indicates, the general schedule of submission dates for CN applications subject to full review remains valid and outstanding unless it is deleted or specifically limited by the Commissioner. Importantly for those applications, the Commissioner is not bound to any pre-determined identification of need for the service and, therefore, the applicant must convince the Commissioner that there is a need for the requested approval. *See N.J.A.C.* 8:33–4.1(a)(3) (explaining that acceptance of applications is not equivalent to finding of need). On the other hand, when the Commissioner issues a "specific call" for CN applications, she must identify in advance, and with specificity as to geographic region if applicable, the particular need for which applications are sought. In other words, the Commissioner initi-

ates the special call based on a departmental finding of a need for the new or enhanced health care service.

The annual schedule provides a salutary service to the health care industry, which had not been provided heretofore. The scheduled call list provides the health care industry with a reliable, recurring schedule of dates when CN applications may be submitted by a provider that seeks to convince the Department that a new or enhanced service should be allowed. That improvement to the CN process was rooted in the CN Commission's recommendations and found its way into the amendments to the CN statute.[5]

■ In this instance, we find that operation of *N.J.A.C.* 8:33–4.1, with its regularized schedule allowing providers to submit CN applications for maternal and child health needs, provided ample basis for the Commissioner's determination to accept Virtua's application for processing. The regulation's general call schedule complied with a recommendation made by the legislatively tasked reform commission. One of the concerns explored by the CN Commission was how to allow the health care industry to have enhanced, and more regular, opportunities to advance provider-initiated requests for sought-after changes in services. A regularized schedule for provider-initiated CN application submissions helped address that concern, in the CN Commission's view.[6] Here,

---

[5] *See L.* 1998, *c.* 43, § 16 (codified at *N.J.S.A.* 26:2H–7c(c)) (requiring Commissioner to publish call schedule for initiation of those services or facilities not exempt from CN requirement and not subject to expedited review).

[6] As the CN Commission realized when making its recommendations to the Legislature for alterations in the CN program, regularity in CN review needed to be enhanced. Various methods of CN solicitation were considered, including retaining a means for the Department to be able to act when it identified a need, but also allowing for provider-initiated requests that would be subject to a timely departmental review. Although the CN statute requires the prior issuance of a CN for a provider to add or enhance a covered service, *see N.J.S.A.* 26:2H–7, nowhere does the statute provide that a CN may only be awarded upon a call by the Department. The industry's complaint with the Department was not that provider-initiated CN requests could not be made, but rather that there needed

in light of the outstanding notice generally inviting providers to submit CN applications for services encompassed under the maternal-and-child-health-need category, the Commissioner's acceptance of Virtua's application for processing comported with that CN reform goal.

Specifically, the Commissioner's acceptance of Virtua's application, and that of others, for changes in designation within existing consortia, demonstrated an appropriate regulatory response to the interaction between the Department's general-notice regulation inviting CN submissions on January 2, 2003, and its later, specific call notices for particular maternal and child health services. We, like the Commissioner and, presumably, the applicants who responded with designation-change requests, find that the Department's identification of a specific need in certain bassinet categories did not rescind the general notice establishing the January 2 date for CN applications concerning maternal and child health needs. Nor did the fact that the Commissioner was soliciting CN applications in respect of membership changes for existing consortia reasonably imply that a status change within existing consortia was off limits.[7]

to be parameters for the Department's timely review of such applications and, concomitantly, an orderly means for others to know about such submissions.

Therefore, the Commission recommended consideration of a hybrid approach, one that allowed applications to be submitted "[(1)] [o]n a regularly scheduled timetable ...; or [(2)] [a]fter a required, scheduled review of methodologies and criteria indicate a need; or [(3)] [s]ome combination of these depending on the service." The third type of notice system identified by the Commission would provide the Commissioner with the ability to monitor services and respond to industry needs and developments, while providers would retain the regularity of review provided through the annual submission dates. That approach was followed in the adoption of *N.J.A.C.* 8:33–4.1, which encompasses maternal and child health needs. Thus, services covered under maternal and child health needs, including designation changes, are among the areas for which a combination of general and specific calls was deemed appropriate.

[7] A hospital's membership affiliation refers to the locality of the maternal and child health consortium to which it belongs. *See N.J.A.C.* 8:33C–1.2. A hospital's

Despite petitioners' assertions to the contrary, the Commissioner satisfied her notice obligations. Having published a general call schedule inviting the submission of CN applications for maternal and child health needs by January 2, 2003, and annually, thereafter, the Commissioner was free to limit or delete any portion of that general notice. Here, none of the subsequent notices calling for specific beds and alterations in consortium membership among providers purported to do that. Certainly, there was no deletion or clear limitation against applications containing a change in designation request for providers within maternal and child health consortia. Although the Commissioner was not bound to a pre-determined finding of need for an additional RPC in the southern New Jersey area by accepting that part of Virtua's CN application for processing, the Commissioner, in accepting the application for review, did not act arbitrarily or unreasonably, nor beyond the scope of her authority.

In this, the Commissioner's first experience under the new methodology of scheduled calls involving maternal and child health care needs, we find that the Commissioner could accept CN applications that included requests to change a provider's designation. In the future, the Commissioner would do well to enhance the clarity of notices involving the intersection of specific needs with the acceptance of applications pursuant to the general call schedule. Nonetheless, we sustain the Commissioner's acceptance of Virtua's application for processing in this instance. Indeed, it is no small point that many other health care facilities also perceived designation changes to be fair game when submitting applications pursuant to the call for maternal and child health needs. Six such applications were received state-wide and were acted on.

Finally, we note that, despite petitioners' inadequate-notice complaint, petitioners were not harmed by the process followed by the Commissioner in this instance. Petitioners fully participated

designation refers to the level and degree of services a particular hospital may offer. *See ibid.*

in the CN process, protesting Virtua's request at every level of review—in its departmental submissions, presentations at the SHPB hearing, and letters to the Commissioner.

In sum, we conclude that the Commissioner did not exceed her authority when she accepted for processing Virtua's CN application that included a request for a designation change.

## V.

### A.

Turning to the merits of the Commissioner's CN grant of the requested bassinets and RPC status to Virtua, we note that the Commissioner's decision correctly identified four criteria necessary for a CN application's approval. In accordance with *N.J.S.A.* 26:2H–8, the Commissioner stated that Virtua's application for a CN could only be granted if it:

(1) is necessary to provide required health care in the area to be served;

(2) can be economically accomplished and maintained;

(3) will not have an adverse economic or financial impact on the delivery of health services in the region or statewide; and

(4) will contribute to the orderly development of adequate and effective health care services.

As to the first inquiry, the Commissioner's analysis in favor of a CN grant jointly addressed Virtua's request for bassinets and for the RPC designation. In justifying the necessity finding for the service area, the Commissioner stated that she "considered the Southern New Jersey Perinatal Cooperative regional perinatal and pediatric plan [that had] identifie[d] a need for intensive bassinets, and the regional CN call need of 28 intermediate and 18 intensive bassinets." She went on to explain that she considered Virtua's high occupancy rate and subsequent neonatal and high risk maternity transfers which prompted the 2002 granting of an emergent CN for 6 intermediate bassinets. The additional capacity of six intermediate bassinets has not alleviated Virtua's growing census. I have also taken into consideration that Virtua's provision of care to a sufficient number of very low birthweight babies to be considered for RPC designation and the fact that Virtua–Voorhees has the largest number of live births of any other hospital in the Southern Consortium.

An economic analysis is involved in the second prong of the test. The Commissioner found the second prong satisfied because a financial analysis performed by departmental staff confirmed that Virtua had the necessary funding to support the RPC designation and the added bassinets.

Turning to the third prong, the Commissioner found that the added bassinets complied with the overall perinatal and pediatric plan for Virtua's maternal and child health consortium and would not negatively impact the delivery of health care in the Camden area. More importantly, as to the designation change, the Commissioner found that it

> would not impact current referral patterns of the other two RPCs in the consortium region (Our Lady of Lourdes Medical Center and Cooper Hospital), since the majority of Virtua's projected additional patients would originate from within the Virtua Health System. The balance of Virtua's additional patients are anticipated to be from Virtua's service area who currently outmigrate to Philadelphia hospitals. Virtua has sufficiently documented that its RPC designation would primarily reduce current transfers out of Virtua's system and recapture patients going out of state, rather than compete with the existing Camden City RPCs for their patients.

Finally, in respect of the fourth requirement, the Commissioner determined that the RPC designation and added bassinets would provide adequate and effective health services to all southern New Jersey residents and, specifically, that the new designation would provide out-migrating families with the option to receive services in New Jersey.

Accordingly, the Commissioner granted the CN for the added bassinets and for the designation change, finding that Virtua's application satisfied the requirements of *N.J.S.A.* 26:2H–8, *N.J.A.C.* 8:33, and *N.J.A.C.* 8:33C. The Appellate Division concluded that that was not an arbitrary or unreasonable exercise of the Commissioner's authority under this statutory and regulatory scheme. *In re Virtua–West, supra,* 390 *N.J.Super.* at 452–55, 915 *A.*2d 1074. In affirming the Commissioner's action, the panel found that the record contained ample credible evidence to support the factual findings in support of the grant of this CN to Virtua. *Id.* at 454–55, 915 *A.*2d 1074.

■ When the administrative record reveals substantial credible evidence to support an agency's express findings, we ordinarily would defer to the administrative determination. *See In re License Issued to Zahl,* 186 *N.J.* 341, 353, 895 *A.*2d 437 (2006) (noting that when agency record contains substantial credible evidence to support findings on which agency action is based, court owes substantial deference to agency's expertise and knowledge in specialized field). However, in our view, the Commissioner elided an important part of her required review in this matter. The Commissioner's examination must include an analysis of the impact that this CN will have on the urban hospitals likely to be affected by its grant.

### B.

When the Legislature established the CN Commission, it charged the group with studying the impact of eliminating the CN requirement. *L.* 1998, *c.* 43, § 17. In particular, the Legislature required a study of the impact that deregulation would have on urban hospitals. *See id.* § 17(b)(1). In compliance with that charge, the CN Commission reported back in February 2000, calling for

> retention of CN requirements for *services [that] have an impact on urban hospitals, access to care,* quality of care, services that are delivered State-wide or on a regional basis and the State General Fund, including programs such as Medicaid.
>
> [ (Emphasis added).]

CN review thus remained an important protective tool in the management of the health of urban hospitals. Indeed, a pervading concern for urban hospitals can be found throughout the CN Commission's report. That concern reflects the long-standing legislative objective to protect urban hospitals. *See N.J.S.A.* 26:2H–6.1(h) (stating that limitation on proliferation of services may continue to be essential to "maintaining the quality of certain health care services, ... to protect the viability of the services as well as the providers now rendering them, to protect the role of

such institutions as urban hospitals, whose importance to the Statewide health care system is indisputable").

The CN Commission's recommendation, which was followed by the Legislature, retained the CN requirement for services that have an impact on urban hospitals. That policy choice requires that the Commissioner fulfill the CN system's promise to provide urban hospitals with protection from undue proliferation of services when assessing individual CN applications. Thus, the Commissioner's analysis must include an examination as to whether a CN's approval will have a substantial negative effect on an urban hospital. When the Commissioner issues a specific call for CN applications, the Department may have ready information about potential effects of a CN grant, including relevant information touching on the likely impact on urban hospitals in the service region. Greater departmental probing may be required when the CN application under review is one that has not been submitted in response to a pre-determined finding of need. In that setting, the Commissioner must take pains to satisfy the Legislature's concern that proliferation of services may affect urban hospitals negatively.

Here the Commissioner's comment on this important issue was, essentially, nothing more than an acceptance of Virtua's proffer that its beds will be filled by currently out-migrating patients, rather than from petitioners' patient population. In so ruling, the Commissioner accepted Virtua's claims that a new RPC was needed; that the purpose of its new designation was merely to reduce current transfers out of its system; and that it would not siphon off the objectors' patients. Those representations, which were strongly contested by the Camden objectors, were not subject to any apparent independent evaluation by the Commissioner, who simply did not discuss whether the addition of another perinatal center would diminish the number of paying patients willing to travel to Camden's hospitals. That, in turn, left unanswered the question of whether the Camden hospitals' ability to provide free or low-cost care to a large, indigent population was at risk.

The Commissioner's duty requires that she abide by her statutory and regulatory charges and examine all relevant evidence in each case. That must include the positions espoused by the objectors. Here, the Commissioner did not analyze, in any meaningful way, whether the grant to Virtua will have an adverse impact on the region's urban hospitals. That omission is a critical failing in a proceeding that has, as one of its pillars, avoidance of negative impacts on the delivery of health care services in the region.

As far as her decision reveals, the Commissioner uncritically accepted Virtua's position without examining and explaining her response to the positions advanced by the objectors. Virtua contends that petitioners' concerns are speculative. That may prove to be true, but on this record we cannot be sure. It may be that there was a basis for her to reach her conclusion to do so, but her decision gives little comfort that the required analysis took place.

Virtua also asserts that it cannot, and should not, be expected to make a showing in its CN application of the likely patient impact on petitioners. That, however, does not excuse the Commissioner from her obligation to satisfy the legislative preference for a regulatory review that will serve as a check on undue harm to our valuable, and vulnerable, urban hospitals. The duty to guard against severe or pervasive negative impacts on urban hospitals when a CN for a new or enhanced service is under consideration lies squarely with the Commissioner.

We recognize that the CN already has been issued and never has been stayed. Nonetheless, in order to fulfill the statutory, and salutary, purposes of the CN system, we must remand this case to the Commissioner for a full analysis and a complete explanation of her decision. On the remand, it may be that Virtua will again receive a RPC designation. That conclusion, however, must be reached through a more careful examination of the record and explication for the determination that is reached.

## VI.

The judgment of the Appellate Division is affirmed in part and the matter is remanded to the Commissioner of Health and Senior Services for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, ALBIN and HOENS—5.

Not Participating—Justices WALLACE and RIVERA–SOTO—2.

*Opposed*—None.