**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1305-16T2

EZZARD WILLIAMS,

    Petitioner-Appellant,

v.

BOARD OF TRUSTEES, POLICE
AND FIREMEN'S RETIREMENT
SYSTEM,

    Respondent-Respondent.

_____

Submitted January 11, 2018 — Decided July 23, 2018

Before Judges Rothstadt and Gooden Brown.

On appeal from the Board of Trustees of the
Police and Firemen's Retirement System,
Department of Treasury, PFRS No. 97967.

Carusa Smith Picini, PC, attorneys for
appellant (Timothy R. Smith, of counsel;
Steven J. Kaflowitz, on the briefs).

Christopher S. Porrino, Attorney General,
attorney for respondent (Melissa Dutton
Schaffer, Assistant Attorney General, of
counsel; Robert S. Garrison, Jr., Deputy
Attorney General, on the brief).

PER CURIAM

Ezzard Williams appeals from an October 18, 2016 final decision of the Board of Trustees of the Police and Firemen's Retirement System (Board). The Board denied his application for accidental disability retirement benefits on grounds that the August 2, 2010 incident upon which his application was based was not undesigned and unexpected and was not the direct result of a traumatic event within the meaning of N.J.S.A. 43:16A-7. The Board also determined that Williams was not entitled to ordinary disability retirement benefits because he was not totally and permanently disabled. In so doing, the Board adopted the recommendation of the Administrative Law Judge (ALJ) that Williams was not entitled to accidental disability retirement benefits, but rejected the ALJ's findings of fact and conclusions of law that Williams was totally and permanently disabled and therefore entitled to ordinary disability retirement benefits. Because we agree with the Board, we affirm.

As background, the Police and Firemen's Retirement System (PFRS), "[l]ike all of the public retirement systems, . . . includes provisions for the grant of ordinary and accidental disability benefits." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 42 (2008) (citing N.J.S.A. 43:16A-6 to -7). N.J.S.A. 43:16A-6(1) provides that a member, meeting the age and service criteria, may be retired on an ordinary allowance

2                                                          A-1305-16T2

provided, that the medical board, after a medical examination of such member, shall certify that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him and that such incapacity is likely to be permanent and to such an extent that he should be retired.

"Essentially, a qualified member who is permanently disabled for any reason will qualify for ordinary disability." Patterson, 194 N.J. at 42.

"To be eligible for greater benefits under the accidental disability provision, however, a PFRS member must satisfy N.J.S.A. 43:16A-7(1)'s more rigorous requirements." Mount v. Board of Trs., ____ N.J. ____, ____ (2018) (slip op. at 29). Under that provision, the PFRS authorizes an award of accidental disability benefits to a member provided that:

> the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.
>
> [N.J.S.A. 43:16A-7(1) (emphasis added).]

In Richardson v. Board of Trustees, Police and Firemen's Retirement System, 192 N.J. 189 (2007), the Court clarified the meaning of the term "traumatic event," and set forth a five-pronged standard mandating that a pension system member seeking accidental disability benefits prove:

> 1. that he is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
>> a. identifiable as to time and place,
>>
>> b. undesigned and unexpected, and
>>
>> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
>
> 4. that the disability was not the result of the member's willful negligence; and
>
> 5. that the member is mentally or physically incapacitated from performing his usual or any other duty.
>
> [Id. at 212-13.]

On April 18, 2011, Williams, then a police officer, applied for accidental disability retirement benefits based on injuries to his left knee sustained on August 2, 2010, while chasing a

carjacking suspect. On May 15, 2012, the Board denied Williams' application, finding that the August 2, 2010 event was "not undesigned and unexpected," and did not directly cause "a total and permanent disability." Williams filed an administrative appeal and the matter was transmitted to the Office of Administrative Law (AOL) as a contested case. During the AOL hearing conducted over multiple dates, Williams, his physical therapist, Kevin Brown, his treating physician, Dr. Richard A. Boiardo, and the Board's physician, Dr. Arnold Berman, testified.

Williams testified he began his employment as a police officer for Irvington Township in 2004 and was a police officer for eight-and-a-half-years. Williams described his duties as "vigorous" and physically demanding, in that he "did a lot of" "running, jumping" and "chasing after guys[,]" and was involved in approximately twenty physical altercations over the years. On August 2, 2010, Williams was working with a partner when he received a radio call reporting the location of a carjacked vehicle. Upon responding to the location, Williams observed a suspect jump out of the vehicle and flee, whereupon Williams exited his police vehicle and pursued the suspect on foot. However, on his third step after emerging from the police vehicle, Williams felt his left knee "buckle" and "[give] way." After taking a few more steps, he could go no further and called his partner for assistance.

Williams testified he had never injured his knee before and had "never felt any pain like [that] before in [his] life." He described the pain he felt "shoot[ing] through his leg" as "really sharp and extreme." After returning to headquarters, Williams reported the injury to his supervisor and his partner later prepared a report documenting the injury. Williams was transported to Saint Barnabas Hospital, where, after an x-ray, he was diagnosed with a sprain. Approximately two weeks later, he returned to full-duty work while receiving physical therapy at Concentra Medical Center (Concentra).

On August 17, 2011, Kevin Brown, a licensed physical therapist employed by Concentra, performed a Functional Capacity Evaluation[1] (FCE) on Williams as ordered by his Police Chief. After Williams completed a pain questionnaire describing his pain level in his left knee, Brown conducted a muscular skeletal examination and performed a functional evaluation, which tested strength, range of motion, and sensation. Brown concluded that as of the date of the FCE, Williams was "unable to work . . . his regular duty job as a police officer, and classified his work capacity as light-

---

[1] A FCE assesses an individual's capacity to perform work activities related to his or her employment. Functional Capacity Evaluation, American Occupational Therapy Association, Inc., https://www.aota.org/about-occupational-therapy/professionals/wi/capacity-eval.aspx. (last visited December 26, 2017).

A-1305-16T2

medium, meaning he could only lift or handle weight anywhere from twenty-one to thirty-five pounds.

Brown's determination was based on the fact that Williams was unable to perform the self-reported duties of a police officer because he could not "run, squat, climb, kneel, . . . crawl," push or pull without experiencing excruciating pain and restricted range of motion.  However, Brown acknowledged that there was no objective way to verify Williams' pain level.  Brown also testified that he did not verify the accuracy of Williams' job description and made no recommendation as to whether Williams would be able to return to work in the future.

Between September 2010 and October 2013, Williams underwent four magnetic resonance imagings (MRIs) of his left knee.  The MRIs taken September 2010, March 2011, and June 2011 all revealed no evidence of tearing or any substantial injury to his knee.  However, the October 2013 MRI showed a chronic sprain to the lateral collateral ligament (LCL), injury to articular cartilage, and evidence of an anterior cruciate ligament (ACL) rupture.  Further, on October 4, 2011, a computed tomography (CT) scan revealed evidence of chondral damage[2] to both the inside or medial

---

[2] Chondral damage is damage to the articular cartilage that covers the bony surfaces within the knee joint and may occur as a result of a pivot or twist on a bent knee.  Chondral Damage, South Bend

joint space and the outside or lateral joint space of the knee and a bony chip in the area of the left hip.

In addition, Williams received two steroid injections for the worsening pain and on December 23, 2010, underwent arthroscopic surgery, neither of which alleviated his symptoms. The operating surgeon, Dr. Patricio Grob, told Williams that he had "something in [his] knee that . . . should have [gone] away when [he] was a child." Dr. Grob also indicated in his operative report that he checked the ACL while performing the surgery and found it was intact.

Williams subsequently filed a workers' compensation claim based on the knee injury and agreed to a settlement. Under the terms of the settlement, he would receive a monetary award as compensation for a 27.5 percent permanent disability to his knee. However, Williams explained that the workers' compensation settlement could not be finalized until his accidental disability retirement application was resolved. Williams also testified that he was examined by Dr. Tiger in connection with the workers' compensation case. According to Williams, Dr. Tiger found him

Orthopaedics, http://www.sbortho.com/centers/Knee/ChondralDamage.html. (last visited December 26, 2017).

disabled as a result of the August 2, 2010 incident but provided no reasoning.

Williams explained that given the physical nature of the job, he was unable to perform many of the duties of a police officer as a result of the injury. As examples, Williams stated he was unable to defend himself or his partner in a physical altercation, patrol on foot, move quickly or run. Williams explained that if he tries to run, "it literally feels . . . like [his] bone is literally smashing into one another."

Dr. Boiardo was qualified as an expert in orthopedic surgery and testified that he treated Williams five times in total between October 2011 and January 2014. Based on his physical examinations of Williams as well as his review of the medical records, Dr. Boiardo opined that as a result of the injury, Williams had developed "traumatic arthritis" on the inside portion of his knee, ruptured his ACL, and had instability in his knee due to the chronic injury to his LCL. He explained that Williams would "have difficulty running on uneven surfaces," "stopping and cutting," and "going up and down stairs," and would not be able to perform the required duties of a police officer. As a result, Dr. Boiardo opined that Williams was "completely and totally disabled from his occupation as a police officer" because of the August 2, 2010 injury, which he characterized as a traumatic event.

9

In that regard, Dr. Boiardo agreed with the assessment of another one of Williams' treating physicians, Dr. James Lee, who opined on August 25, 2011, that Williams had chronic instability of his left knee and would not be able to return to his normal policing duties. On the other hand, while Dr. Boiardo agreed with Dr. Berman's diagnosis that Williams suffered from "degenerative joint disease," he disagreed with Dr. Berman's conclusion that the arthritic knee condition existed before the subject injury occurred. Rather, Dr. Boiardo believed the subject injury occurred and the arthritic condition ensued, as evidenced by Williams performing policing duties for almost eight years with no knee problems until the incident occurred. Dr. Boiardo also disagreed with Dr. Berman's assessments that Williams had fully recovered and could "participate in all activities of daily living."

On cross-examination, Dr. Boiardo was questioned on how the ACL rupture could have gone unnoticed in three prior MRIs and in the arthroscopic surgery performed by Dr. Grob, who noted in the operative report that the ACL was intact. Dr. Boiardo explained that "[t]here's a ligament in front of the ACL, which sometimes in a thickened situation . . . is hypertrophy . . . [and] sometimes, that can be mistaken for an intact ACL." In addition, according to Dr. Boiardo, while MRIs are "very magical diagnostic tool[s]," they are not "a hundred percent."

A-1305-16T2

Dr. Boiardo thus posited that the ACL "could have been completely ruptured and missed" or ruptured "with subsequent wear and tear" following the injury. However, he maintained "that the injury caused the derangement," which "lead[] to the degeneration," not the other way around as Dr. Berman indicated. During cross-examination, Dr. Boiardo also defended errors in his report,[3] explaining that he was more accustomed to conducting clinical work than writing reports and relied on his office staff to complete the paperwork.

Dr. Berman was also qualified as an expert in orthopedic surgery. He testified that on March 1, 2012, he conducted an independent medical evaluation of Williams, who was then thirty-six years old, and reviewed all relevant medical records available to him. During his physical examination, he found Williams had full range of motion in his left knee with no indication of an ACL tear or a meniscal tear, no significant atrophy, and no irregularities over the kneecap. According to Dr. Berman, "[t]he knee was stable to varus and valgus," meaning "the ligaments on the inside and the outside of the knee were stable" and there was no "laxity."

---

[3] For example, Dr. Boiardo explained that the diagnosis of a meniscus tear recorded in an October 20, 2011 report was incorrect.

In addition, he found "no tenderness, swelling, heat, erythema[4] or effusion," meaning there was "no measurable fluid in the knee at that time." Dr. Berman explained that given the sensitivity of the "joint lining . . . to any irritation or injury," "the fact that there [was] no effusion [was] very important because it show[ed] that the joint lining [was] normal," and was "a sign that there [was] nothing of a serious nature in the knee."

As a result of his examination, Dr. Berman diagnosed Williams with "degenerative joint disease," or "osteoarthritis," which is "a general term for [an] arthritic condition," with "no effects of the resulting trauma." He concluded that Williams' "condition was clearly [and] very definitively not related to [the August 2, 2010] accident" and there was no aggravation of a pre-existing condition caused by the accident.

In rendering his diagnosis, Dr. Berman relied on the minimal degree of arthritis shown on the 2011 CT scan as well as the fact that the three MRIs conducted before he examined Williams "were all a hundred percent normal,"[5] "[t]he x-ray [was] normal," and

---

[4] Dr. Berman defined an erythema as redness of the skin caused by increased blood flow to an injury.

[5] The October 2013 MRI was conducted after Dr. Berman's evaluation.

A-1305-16T2

Dr. Grob's operative report showed no meniscal or ACL tear. Dr. Berman pointed out that his arthritis diagnosis was based solely on the CT scan that "showed slight but not disabling narrowing of the joint," and was therefore "a radiologic finding without any clinical correlation." Further, Dr. Berman opined that Williams' condition was not a disabling condition and the FCE did not alter his opinion because there was "no objective evidence" in the FCE that correlated to his examination.

On August 16, 2016, the ALJ rendered his Initial Decision, concluding that while Williams "proved by a preponderance of the evidence that he was totally disabled and unable to perform the duties" required of a police officer, he did not prove that his disability was "the direct result" of "a traumatic event that [was], among other things, undesigned and unexpected." In rendering his decision, the ALJ found Williams to be a "credible, truthful witness," and accepted his description of what transpired on August 2, 2010 and the subsequent medical treatment he underwent.

However, the ALJ found "no evidence" of "an unexpected happening, not the result of pre-existing disease alone or in combination with the work," to meet the Richardson test and "show that the incident that caused the injury was a traumatic event

13

that [was] . . . undesigned and unexpected." In fact, according to the ALJ,

> [Williams] acknowledged that he was performing his usual work in the usual and customary manner; responded to the incident in accordance with the police training that he received; his job specification include[d] the use of "hands-on force" to apprehend a suspect; the specification contemplate[d] that he may be required to use physical force during the arrest of a suspect.

Acknowledging that "[t]here [was] a general consensus that [Williams had] a degenerative joint disease," the ALJ found "no evidence to suggest that the alleged traumatic event merely aggravated a previous condition," but rather that Williams' "disability developed over time." However, because he was not "employable in the general area of his ordinary employment" as a result of the disability, the ALJ concluded that Williams was permanently and totally disabled. Accordingly, the ALJ recommended that the Board's denial of Williams' accidental disability retirement benefits application be affirmed, but that the determination that Williams was not eligible for ordinary disability retirement benefits be reversed.

In rendering his decision, the ALJ discussed extensively the "differing views" of the two experts, with Dr. Boiardo concluding that Williams' injury on August 2, 2010, rendered him disabled and "incapable of performing his required duties," and Dr. Berman

14

concluding that Williams "was not totally and permanently disabled and [was] able to perform the duties of a police officer." The ALJ noted that where there is conflicting medical testimony, under the case law, the weight to which an expert's opinion is entitled may be determined by the underlying facts and reasoning upon which the opinion is based as well as corroborating records of other physicians. Moreover, according to the ALJ, greater weight should ordinarily be accorded to the treating physician as opposed to an evaluating physician who has only met with the employee on one occasion.

Nevertheless, the ALJ "was better persuaded by, and [gave] greater weight to, the testimony of Dr. Berman" because his conclusions were consistent with the findings of both Williams' surgeon and one of his treating physicians. The ALJ found Dr. Boiardo's demeanor to be "somewhat flippant" and explained that Dr. Boiardo "did not exhibit cognizance of the importance of accurate and complete medical reporting," and "did not offer any explanation for how the surgeon who actually viewed the interior of [Williams'] knee during the surgery, could have 'missed' the damage to the areas of the knee that he operated on; 'damage' that was not evident in the MRI reports."

Thus, consistent with Dr. Berman's opinion, the ALJ concluded that the August 2, 2010 incident did not cause a disabling injury

15

to Williams' knee. However, because "[a]ll of the doctors agree[d] that [Williams] suffer[ed] from a degenerative joint disease," and "[t]he physical therapist support[ed] those conclusions," the ALJ determined that the disease rendered Williams permanently and totally disabled from the performance of his duties as a police officer, notwithstanding Dr. Berman's contrary opinion.

On October 18, 2016, after considering the parties' exceptions and the ALJ's initial decision, the Board adopted the ALJ's recommendation that Williams was not entitled to accidental disability retirement benefits, but rejected the ALJ's findings of fact and conclusions of law that Williams was totally and permanently disabled. The Board noted that while properly "giving 'greater weight to[] the testimony of Dr. Berman,'" the ALJ failed "to resolve the experts' disagreement as to the nature of the diagnosis (traumatic v. degenerative [osteoarthritis])" nor "explain why he dismissed the opinions of [Dr.] Berman about Williams'[] alleged total and permanent disability," or "why he has not accepted [Dr.] Berman's conclusions regarding the lack of objective evidence of impairments to Williams['] knee."

According to the Board, the ALJ's only explanation was that "[a]ll of the doctors agree[d] that [Williams] suffer[ed] from a degenerative joint disease [and] [t]he physical therapist support[ed] those conclusions." However, "simply having a

16                                                    A-1305-16T2

diagnosis of a condition like degenerative arthritis joint disease does not equate to disability" and Brown's testimony as a physical therapist was "in no way diagnostic" and did not support a finding of disability. Further, the Board reasoned that whereas Dr. Boiardo diagnosed traumatic osteoarthritis as a direct result of the August 2, 2010 incident, Dr. Berman diagnosed degenerative or wear and tear osteoarthritis as "a radiological finding" based on the CT scan showing "a slight, but not disabling, narrowing of the joint[,]" despite there being no "clinical correlation on his examination."

The Board determined that there was no "competent, credible evidence in the record" to "support the ALJ's conclusion that Williams [was] permanently and totally disabled" and "[t]o the extent the ALJ relie[d] on Brown's testimony, Brown . . . gave 'non-medical' testimony . . . [and] made 'no final recommendation as to whether [Williams] [could] return to work.'" Accordingly, the Board determined that because the August 2, 2010 incident was not undesigned, unexpected, or the direct result of a traumatic event, Williams was not entitled to accidental disability retirement benefits. Further, because Williams was not permanently and totally disabled, he was not entitled to ordinary disability retirement benefits. This appeal followed.

On appeal, Williams contends that the Board erred in not accepting Dr. Boiardo's expert testimony; failing to find Williams permanently and totally disabled as the ALJ did; failing to causally relate his permanent injury to the August 2, 2010 incident; and determining that the August 2, 2010 incident was not undesigned and unexpected and not the result of a traumatic event. We disagree.

"Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). Reviewing courts presume the validity of the "administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014). For those reasons, "an appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Application of Virtua-West Jersey Hosp. for a Certificate of Need, 194 N.J. 413, 422 (2008). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

"[T]he test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs." Brady v. Bd. of Review, 152 N.J. 197, 210 (1997) (quoting Charatan v. Bd. of Review, 200 N.J. Super. 74, 79 (App. Div. 1985)). "Where . . . the determination is founded upon sufficient credible evidence seen from the totality of the record and on that record findings have been made and conclusions reached involving agency expertise, the agency decision should be sustained." Gerba v. Bd. of Trs., Pub. Emps.' Ret. Sys., 83 N.J. 174, 189 (1980). That said, appellate courts do review de novo an agency's interpretation of a statute or case law. Russo, 206 N.J. at 27.

Williams challenges the Board's rejection of the ALJ's determination that he was totally and permanently disabled and therefore entitled to ordinary disability retirement benefits. Indeed, an agency's authority to reject and modify an ALJ's initial decision is limited. Specifically, pursuant to N.J.A.C. 1:1-18.6(b),

> [t]he order or final decision rejecting or
> modifying the initial decision shall state in
> clear and sufficient detail the nature of the
> rejection or modification, the reasons for it,
> the specific evidence at hearing and
> interpretation of law upon which it is based

and precise changes in result or disposition caused by the rejection or modification.

We are satisfied, however, that the Board comported with this legal mandate in its October 18, 2016 decision, rejecting the ALJ's findings of fact and conclusions of law in relation to Williams' entitlement to ordinary disability retirement benefits. In so doing, we conclude that the Board correctly determined that the record did not support the ALJ's determination that Williams was totally and permanently disabled.

To qualify for ordinary disability retirement benefits under N.J.S.A. 43:15A-42, a public employee bears the burden of proving permanent and total disability from performing their normal employment duties. Bueno v. Bd. of Trs., Teachers' Pension & Annuity Fund, 404 N.J. Super. 119, 126 (App. Div. 2008). Guided by our limited scope of review, we discern no error in the Board's decision to reject the ALJ's decision.

As the Board stated, although the ALJ evaluated the expert testimony and concluded Dr. Berman's opinions regarding Williams' condition and ability to work as a police officer were more persuasive than Dr. Boiardo's, the ALJ failed to address his categorical rejection of Dr. Berman's opinion that Williams was not totally and permanently disabled. Because the Board's determination was amply supported by credible evidence, was

neither arbitrary, capricious, nor unreasonable, and complied with N.J.A.C. 1:1-18.6(b), we discern no basis to intervene.

Williams also argues that he is entitled to accidental disability retirement benefits because the August 2, 2010 "injury was a qualifying traumatic event, undesigned and unexpected, under Richardson." However, an individual seeking accidental disability retirement benefits must prove a disabling permanent injury, and must produce "such expert evidence as is required to sustain that burden." Patterson, 194 N.J. at 51.

Because we conclude that the Board correctly rejected the ALJ's conclusion that Williams was totally and permanently disabled, we need not address whether the August 2, 2010 injury was a qualifying traumatic event as he was otherwise ineligible for benefits based on his failure to prove that he suffered a disabling permanent injury. "We rely upon the expertise of the [Board] to separate legitimate from illegitimate claims," ibid., and we are satisfied that the Board's "determination is founded upon sufficient credible evidence seen from the totality of the record." Gerba, 83 N.J. at 189.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1305-16T2