991 A.2d 265 (2010)
412 N.J. Super. 466
The CITY OF PLAINFIELD and Mayor Sharon Robinson-Briggs (in her official capacity), Appellants, and
People's Organization for Progress and Restore Muhlenberg f/k/a Save Muhlenberg, Appellant,
v.
NEW JERSEY DEPARTMENT OF HEALTH AND SENIOR SERVICES; Solaris Health System, Inc.; and Muhlenberg Regional Medical Center, Inc., Respondents.
In re Muhlenberg Regional Medical Center.
A-0107-08T3, A-0179-08T2
Superior Court of New Jersey, Appellate Division.
Argued February 23, 2010.
Decided April 12, 2010.
*266 Debra A. Sahler, Warren, argued the cause for appellants (Ventantonio & Wildenhain, attorneys; Ms. Sahler, of counsel and on the brief).
Bennet D. Zurofsky, Newark, argued the cause for appellant People's Organization For Progress and Restore Muhlenberg f/k/a Save Muhlenberg.
Michael J. Kennedy, Deputy Attorney General, argued the cause for respondent NJ Department of Health and Senior Services (Paula T. Dow, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Mr. Kennedy, on the brief).
*267 Kevin McNulty, Newark, argued the cause for respondents Solaris Health Systems and Muhlenberg Regional Medical Center, Inc. (Gibbons, P.C., attorneys; Mr. McNulty, on the brief).
Eric M. Bernstein & Associates, Warren, for amicus curiae Borough of Plainfield (Mr. Bernstein, of counsel; Mr. Bernstein and Wendy L. Wiebalk, on the brief).
Before Judges CARCHMAN, PARRILLO and LIHOTZ.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
Founded in 1877 in response to a public awareness of the need for a health-care facility, the Muhlenberg Hospital (later styled as the Muhlenberg Regional Medical Center) was established to serve the City of Plainfield (Plainfield) and its environs.[1] Muhlenberg was a important part of the community not only providing medical care but generating popular response and financial and volunteer support from its citizen-constituents. It inspired unique traditions such as the playing of Brahms' lullaby signaling the birth of a child. It thrived as Plainfield thrived, and its population base expanded. Over the years, Muhlenberg served tens of thousands of residents who looked to it as a critical community resource.
In recent years, Muhlenberg faced a new reality. Not unlike other hospitals in New Jersey, its medical, administrative and maintenance costs spiraled, its physical plant aged, and Plainfield's economic base deteriorated; soon Muhlenberg's prime source of revenue was no longer private-pay patients but those on government assistance. Instead of a thriving, fiscally-sound institution, Muhlenberg reflected declining admissions and mounting losses.
In 1997, Muhlenberg merged with the JFK Health System to form Solaris Health System, Inc. Despite attempts to rehabilitate the hospital, Solaris determined that it would close Muhlenberg. On March 3, 2008, Solaris applied to Heather Howard, the Commissioner of the Department of Health and Senior Services (the Department), for a certificate of need (CN) to shut down Muhlenberg as a general acute care hospital. By final decision dated July 29, 2008, Commissioner Howard granted Solaris's CN application, subject to eighteen conditions. Solaris surrendered Muhlenberg's license on August 22, 2008.
In this consolidated appeal, appellants Plainfield and Mayor Sharon Robinson-Briggs (collectively referred to as Plainfield), and the People's Organization for Progress and Restore Muhlenberg f/k/a Save Muhlenberg (POP) challenge the decision of Commissioner Howard to grant a CN to close the hospital. On appeal, appellants argue that the Commissioner's decision was arbitrary and capricious. Respondents maintain that the Commissioner's decision was properly substantiated; alternatively, they assert that the appeal is moot because appellants did not appeal from the Commissioner's denial of their request for a stay of the CN and Muhlenberg's closing.
During the pendency of the CN application, the Supreme Court decided In re Application of Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 945 A.2d 692 (2008) (Virtua), *268 imposing certain obligations on the Commissioner when considering CN applications as applied to urban hospitals. While we agree that Muhlenberg's closing renders this appeal as to the closing, per se, moot, we choose to address the merits and applying Virtua, we conclude that the Commissioner properly, not arbitrarily or capriciously, and subject to the conditions imposed, granted a CN to allow for the closure of Muhlenberg.

I.
Consideration of the significant issues raised on appeal requires an expansive exposition of the facts derived from the record before the Commissioner. As we previously noted, Muhlenberg was established in Plainfield in 1877. In 2007, it was licensed for 282 medical/surgical beds, thirty obstetrics/gynecology beds, nineteen adult ICU/CCU beds, sixteen acute psychiatric beds, and eight adult closed acute psychiatric beds. It offered medical care, intensive care, basic obstetrics, inpatient psychiatric services, inpatient and outpatient surgery, therapeutic services, emergency care, home health services, acute hemodialysis services, cardiac catheterization, and primary and elective angioplasty. Muhlenberg also served as a teaching hospital, maintaining a residency program and a school of nursing.
Based upon 2006 census data, Muhlenberg's primary service area of North Plainfield, Plainfield and Scotch Plains encompassed an eight-mile radius containing a population of 329,184. Notably, based upon household income, Plainfield is considered a medically underserved area and 6.9% of households live below the poverty line. Indigent patients made up fourteen percent of Muhlenberg's total discharges, and minority patients approximately fifty to sixty percent.
In 1997, Muhlenberg merged with JFK Health System to create Solaris. According to Solaris, this merger was sought by Muhlenberg upon its realization that its ability to survive as an acute care hospital was in jeopardy. In addition to JFK Medical Center (JFK) in Edison and Muhlenberg, Solaris's affiliates included three JFK Hartwyck Nursing, Convalescent & Rehabilitation Centers, JFK Johnson Rehabilitation Institute, New Jersey Neuroscience Institute, the Whispering Knoll assisted living facility, Diabetes Center of New Jersey, Muhlenberg School of Nursing, Medical Imaging & Therapeutic Services, and the JFK MediPlex Surgery Center.
According to Solaris, in the ten years following the merger, it invested over $50,000,000 in: (1) upgrades to Muhlenberg's facilities and equipment; (2) physician recruitment; and (3) program development, including a new wound center, lithotripsy, elective angioplasty and a sleep lab. Through these investments, Solaris attempted to enable urban Muhlenberg "to compete with neighboring suburban hospitals for patient volume and payer mix." However, according to Solaris, despite these efforts, Muhlenberg was unable to attract new privately insured patients to the facility. Instead, between 2000 through 2007, medical/surgical acute admissions dropped 18.5% and obstetric utilization dropped nine percent. During the same years, the average daily census at Muhlenberg declined from 182 to 135 patients. Notably, though, in 2005, 2006 and 2007, the Muhlenberg emergency department saw 33,836, 33,583 and 34,512 patients, respectively. Only 18.2% of these emergency visits resulted in admission to the hospital. Solaris asserted that this indicated that the emergency department was primarily serving as a resource for non-acute diagnostic and treatment services.
*269 Between 2000 and 2006, Muhlenberg consistently reported annual operating losses of $2,000,000 to $5,000,000. Solaris attributed these losses to Muhlenberg's declining admissions, and the fact that Muhlenberg drew upon a narrow geographic area that was overly dependent on government payers. Approximately seventy-one percent of Muhlenberg's patients, as opposed to the state average of fifty-nine percent, were dependent upon government payers (Medicare, Medicaid and charity) or were uninsured. Solaris subsidized these losses through JFK Health System entities with JFK being ultimately responsible for Muhlenberg's debt service and pension payments.
In addition, the staff recognized a new dynamic affecting the hospital. There was "increased competition and a shift of volume from hospital settings to freestanding, physician owned ambulatory care facilities." No longer subject to CN requirements, by 2008, nine diagnostic imaging facilities and five ambulatory surgery facilities were established in Muhlenberg's primary service area.
By 2007, Muhlenberg was operating at a maintained bed occupancy rate of less than sixty percent, and less than forty percent of its licensed bed capacity. Its annual operating loss had grown to $16,500,000. Solaris blamed this increase on new reductions in state funding and its disproportionate burden of caring for state-insured and uninsured patients. Solaris anticipated that Muhlenberg's deficit for 2008 would reach approximately $18,000,000. At the same time, Solaris estimated that a major capital infusion would be required over the next five to ten years to upgrade Muhlenberg's aging physical plant.
In November 2007, Solaris's Board of Directors authorized management to offer Muhlenberg for sale. Solaris engaged an investment banking firm to market the hospital. Although four to six entities expressed interest in purchasing Muhlenberg, no formal offers were ultimately submitted. According to Solaris, most of these potential purchasers were unable to demonstrate an adequate source of financing to purchase and operate the hospital.
On February 21, 2008, Solaris's Board of Trustees voted to close Muhlenberg. According to Solaris, its Board reached this difficult decision after spending nine months considering every possible scenario to avoid closure, including eliminating services and outsourcing. The Board ultimately concluded that Muhlenberg was not financially sustainable based upon: (1) the underutilization of services at Muhlenberg coupled with overwhelming financial pressures; (2) the inability of Solaris's other affiliates to continue to subsidize Muhlenberg's losses without jeopardizing Solaris's overall viability and the availability of healthcare services for both the Plainfield and Edison communities; and (3) the fact that, according to current estimates, Muhlenberg would need to increase its total patient volume by 110.7 percent over the next five years to break even  a seemingly impossible task.
Solaris's Board believed that a consolidation of acute care services represented the most efficient use of limited resources to meet the needs of Plainfield's residents. It also asserted that an orderly closure was preferable to a chaotic bankruptcy. It admitted, though, that "[i]ndigent minority and other medically underserved patients have clearly relied on Muhlenberg ... for healthcare services. ... The closure of Muhlenberg ... will require special diligence and sensitivity to ensure that medically underserved and indigent patients continue to have comparable access to healthcare services."
Solaris filed an application for a CN to close Muhlenberg as a general acute care *270 hospital. Solaris required $70,000,000 in borrowing to both close Muhlenberg and upgrade its JFK facilities in Edison. This included $18,500,000 to retire outstanding tax exempt debt owed on Muhlenberg, $15,000,000 to fund pension obligations for Muhlenberg employees, $8,000,000 to fund severance for displaced Muhlenberg employees, and $6,500,000 to fund stranded and closing costs. The remaining $22,000,000 would be spent on upgrades to JFK in Edison. It further explained that it intended to close all of Muhlenberg's inpatient medical/surgical, ICU, obstetrics, and psychiatric beds, plus all related diagnostic and treatment services. Muhlenberg's internal medicine residency program, which provided coverage for indigent patients, would also have to close. Solaris planned to relocate Muhlenberg's Wound Care Center, bariatric surgery program, cardiac catheterization lab, and sleep lab to JFK. In recognition of the heavy usage of Muhlenberg's emergency department, Solaris proposed to maintain a satellite emergency department (SED), with attendant basic imaging and lab services, at the campus. It also intended to continue offering on-site hemodialysis service (operated by contractor DeVita), and to keep Muhlenberg's school of nursing open.
Solaris identified nine other hospitals in the vicinity of Muhlenberg that could absorb displaced patients: (1) JFK (5.46 miles away with an average travel time from Muhlenberg of eighteen minutes); (2) Robert Wood Johnson University Hospital at Rahway (7.57 miles away, twenty-two minute average travel time); (3) Overlook Hospital (9.78 miles away, twenty-four minute average travel time); (4) Saint Peter's University Hospital (10.37 miles away, twenty-nine minute average travel time); (5) Raritan Bay Medical Center at Perth Amboy (10.46 miles away, twenty-nine minute average travel time); (6) Robert Wood Johnson University Hospital (10.81 miles away, thirty-three minute average travel time); (7) Somerset Medical Center (11.56 miles away, thirty-one minute average travel time); and (8) Trinitas  Jersey Street Campus (13.08 miles away, thirty-eight minute average travel time); (9) Raritan Bay Medical Center At Old Bridge (20.14 miles away, thirty-nine minute average travel time). Solaris noted that the occupancy rates at these hospitals ranged from forty-five percent to eighty-seven percent for maintained beds.
Plainfield has a federally qualified Neighborhood Health Center (NHC-Plainfield) in the community, with six satellite locations, five of which were also in Plainfield, that provides health services to local residents. These health services include: abnormal pap follow-up; annual exams; birth control education; birth control/family planning; breast exam; cancer screening (Pap test); counseling for birth control, pregnancy options, STD, tubal ligation, vasectomies, depo-provera; emergency contraception; Hepatitis B vaccine; high blood pressure screening; HIV/AIDS testing and counseling; HPV vaccine; immunizations; male health services; menopause/midlife services; post-abortion exams; pregnancy education, testing and counseling; sexually transmitted infection testing and treatment; urinary tract infection diagnosis and treatment; and vaginal infection testing and treatment.
Twenty-five to thirty percent of Muhlenberg's patients would be admitted to JFK in Edison. To handle the increased volume, Solaris proposed to: (1) renovate and expand its cardiac suite; (2) reopen twenty-six unstaffed beds and rededicate five additional rooms for patient use; (3) add a new thirty-eight bed unit; and (4) expand its emergency department. Solaris claimed that it had made efforts to reduce the average length of patient stays at JFK *271 in order to free up beds, but given the eighty-seven percent occupancy rate for obstetric beds at JFK, JFK would only be able to absorb some of Muhlenberg's obstetrics patients.[2] JFK also did not currently offer any psychiatric services.
Solaris recognized that the closure of Muhlenberg would require that patients travel farther to receive care. It proposed to collaborate with the Plainfield Red Cross to establish a network of transportation services utilizing taxi vouchers and van services. It offered to provide taxi and shuttle service for three years and suggested that local emergency response services could be utilized to transport patients to other area hospitals.
In conjunction with its application, Solaris submitted 2005 and 2006, but not 2007, audited financial statements for Muhlenberg as well as documentation confirming that, in October 2007, Moody's Investors Service had downgraded JFK's bond rating from Baa2 to Ba1 (noninvestment grade). Moody's noted that it had "consider[ed] the consolidated financial performance of the entire Solaris System in our rating of JFK and its guarantee of [Muhlenberg's] debt service. The outlook is negative at this lower rating category."
In May and June 2008, the SHPB held public hearings on the CN. More than 1000 community members attended each hearing. All who spoke opposed the closure of Muhlenberg, citing concerns over access, emergency services, lack of transportation and the economic harm to Plainfield as a result of the loss of over 1000 jobs. Community groups argued that Muhlenberg was not failing because of poor quality of care, but because of Solaris mismanagement and the shortcomings of the state health care system. They alleged that Solaris had been shifting revenue-generating services away from Muhlenberg since 2003. The objecting community members also asserted that Solaris had contributed to the reduction in the number of private patients with insurance delivering babies at Muhlenberg when they moved the hospital's pediatrics practice to JFK. They noted that Muhlenberg's former dialysis center, which had been sold by Solaris as an unprofitable business, was still being operated by DaVita on Muhlenberg's campus, offered six days per week service, and was one of the largest dialysis centers in the State. Moreover, the objectors pointed out that JFK had recently sent 300 elective angioplasties to hospitals other than Muhlenberg, thereby depriving the hospital of $10,000,000 in revenue. They also noted that Solaris had sold Muhlenberg's SurgiCenter and moved the Diabetes Center off of Muhlenberg's campus.
Other community groups and individuals argued that three months was not a sufficient time period to find a buyer for the hospital and that the sale price of $70,000,000 was "ridiculous" given that "business ha[d] been diverted and the building gutted of equipment." Still others expressed surprise at the fact that Solaris was willing to borrow $70,000,000 to close the hospital, rather than utilizing that money to try to rehabilitate and support it.
Community groups requested that an independent community needs assessment and financial audit be performed before Muhlenberg was allowed to close. Others asked for a postponement of any decision for three to six months so that a buyer for the hospital could be located. Alternately, these groups asked that, if a CN were granted, Solaris be required to retain Muhlenberg's license so as to facilitate a *272 transfer of ownership to a new entity if a buyer were located. Mayor Robinson-Briggs of Plainfield requested that Muhlenberg be turned over to Plainfield, a state audit be performed, a new Board of Directors be put in place, and a lottery be held for a cash infusion. It was also noted that Solaris had paid only $1 for the hospital campus in 1997.
Despite the community opposition, SHPB staff recommended that the CN be granted subject to fourteen conditions. In pertinent part, SHPB staff concluded that
the applicant's decision to close Muhlenberg is sound and in the best interest of the health care delivery system in Union and surrounding counties. The objectives of this closure are to maintain accessibility and availability of services at current levels and strengthen the financial viability of the Solaris Health System. It is also noteworthy that Assemblyman Jerry Green established a local health care task force to address access and availability of services. The Department was invited to participate and attended several meetings of the task force. The task force focused on ways for local providers to better coordinate services for Plainfield area residents. Department staff does, however, believe that the implementation of a SED is necessary at the Muhlenberg campus given the number of emergency room visits for the years 2005 through 2007, which were recorded as 33,836, 33,583 and 34,512, respectively, as reflected in Condition 8. In addition, staff believes that continuation of prenatal/obstetric and primary care services will need to be continued in the Plainfield area and these are reflected in Conditions 6 and 7, respectively. Furthermore, staff believes that in order to continue medical care at the same level while minimizing any loss of access, continuity or quality of care, a transportation or shuttle system to JFK and the other surrounding hospitals must be implemented at the Muhlenberg site and made available to the patient population within the area, as reflected in Conditions 10, 11 and 12.
Notably, as its first condition to the granting of the CN, SHPB staff recommended that Solaris be
permitted to retain the hospital license for a period of time not to exceed 24 months, commencing on the date of the approval of the closure of Muhlenberg by the Commission. ... A purchaser who intends to re-establish an acute care hospital at the Muhlenberg site must comply with all current statutory and regulatory requirements and commence operation prior to the expiration of the 24 month period.
In her decision of July 29, 2008, granting the CN, the Commissioner initially found that, if Muhlenberg were to close, the greater Plainfield community, including the indigent and other medically underserved residents, would continue to have access to inpatient health care services. She was satisfied that Muhlenberg was being fatally underutilized, noting that, in 2005, 2006 and 2007, Muhlenberg had an average daily census of only 103.75, 109.59 and 98.96 patients, respectively, out of 282 licensed medical/surgical beds. The Commissioner observed that the needs of Muhlenberg's patients could be accommodated through the use of surplus licensed acute care beds at other hospitals in Union, Somerset and Middlesex counties. In this regard, the Commissioner noted that the average occupancy rates for licensed medical/surgical beds at eight other area hospitals ranged from 39.6% to 91.5%, leaving a more than sufficient number of beds for Muhlenberg patients.
The Commissioner rejected the notion that the closure of Muhlenberg would result *273 in a need for specialized services such as cardiac services, psychiatric services, and both inpatient and outpatient obstetrical services. She noted that all of these services would be available at JFK and other area hospitals. She further observed that: (1) JFK had applied to participate in the elective angioplasty demonstration project; (2) Princeton House Behavioral Health Unit of the University Medical Center at Princeton had been granted temporary approval to operate six additional short-term care facility (STCF) beds; (3) Trinitas and Raritan Bay had offered to provide sixteen additional psychiatric STCF beds; and (4) Trinitas had agreed to provide inpatient obstetrical services and also oversee the midwifery program at the NHC-Plainfield. The Commissioner further pointed out that, in 2007, the Department had authorized a grant of $300,000 to NHC-Plainfield for the expansion of its services. Finally, the Commissioner emphasized that, as a condition to the CN, Solaris would be required to maintain both primary care services and a SED on the Muhlenberg campus.
The Commissioner found that Solaris's application was "in full compliance" with all access requirements. She accepted Solaris's representation that outreach efforts to low income, racial and ethnic minorities, women, and disabled and elderly patients would continue to be made by JFK, Trinitas, NHC-Plainfield and the SED. She was satisfied that indigent care would continue to be provided, noting that she had conditioned the CN on the establishment of a Community Advisory Group (CAG) that would monitor the availability of health care services in the community.
Next, the Commissioner considered the financial resources available to Muhlenberg. The Commissioner made the following findings:
I am convinced that if the annual operating losses at Muhlenberg continue, JFK, which is operated by Solaris and is the closest area hospital to Muhlenberg may seek bankruptcy protection. I believe the closure of Muhlenberg by Solaris would maintain access to inpatient services, create operational efficiencies, enhance revenues, and improve resource utilization to reduce the risk of future operating losses at JFK. It is appropriate to review this application as it relates to the availability of health care services in the surrounding area. ... I recognize that Solaris can no longer afford the multi-million dollar annual operating losses at Muhlenberg, which began to accelerate in 2007, when the operating deficit reached $16.5 million, and is projected to reach $18 million in 2008. Muhlenberg is not a financially sustainable hospital, and the additional losses at Muhlenberg, were it to remain open, would threaten the financial viability of JFK and risk the closure of both hospitals. The impact of closure of both hospitals would significantly impact the availability of health care services in the service area
. . . .
In reviewing the transcripts from the public hearings and the written comments, I found many references to the availability of financial information provided by Solaris. Pursuant to existing administrative rules, hospitals are required to submit financial information to the Department consistent with Generally Accepted Accounting Principles. Specifically, with respect to the financial conditions reported by Solaris, the New Jersey Health Care Facilities Financing Authority reviewed the 2007 audited financial statements for [Muhlenberg] prepared by the independent auditing firm Parente Randolph. The statements *274 show that as of December 31, 2007, liabilities exceeded unrestricted assets by $9.2 million and unrestricted cash reserves were only $3.1 million. Further, for the 12 months ended December 31, 2007, expenses exceeded revenue by $16.7 million. Based on [Muhlenberg's] poor financial condition, the auditors have expressed doubts as to whether [Muhlenberg] can continue to operate. [JFK] is ultimately responsible for the debt service and pension payment of Muhlenberg. As such, continued losses at Muhlenberg would jeopardize the financial viability of [JFK]. Additionally, in October 2007, Moody's Investor Services downgraded JFK's bond rating ... noting that "[Muhlenberg's] financial impact has taken its toll, and has been a major contributor to the declining credit profile of Solaris." Further, on June 16, 2008, Moody's downgraded Muhlenberg's rating. ... Given the financial situation of Muhlenberg and its parent, Solaris, the approval of the closure through a public process is far preferable to the alternative, a filing for bankruptcy.
The Commissioner dismissed the notion that Solaris had refused to sell the hospital. She found that, despite Solaris's timely engagement of a hospital acquisition broker, no viable candidate had come forward with an offer to buy the hospital. The Commissioner rejected the recommendation of the Department staff and the request of the community that Solaris be permitted to retain Muhlenberg's license for some period of time so that it could be readily transferred to an entity prepared to operate an acute care hospital at the Muhlenberg site. Rather, she ordered that Solaris surrender Muhlenberg's license within ten days of closure. She explained that, if an entity willing and able to operate Muhlenberg were found
the Department's regulatory process requires that the entity file an application for a certificate of need to operate an acute care hospital in Plainfield, and that the application be subject to the Department's full CN review process. I am sensitive to the concerns of the community regarding the desire to leave open the possibility that an acute care hospital may be operated in Plainfield sometime in the future. However, I find that allowing Solaris to continue to hold the license for a period of time in order to facilitate a transfer of the license is not required in order to accomplish that goal. If Solaris' license is terminated, and the Department subsequently determines that there is a need for an acute care hospital in the community, the Department may issue a call for applications for a[CN] to provide those services and the applications would be subject to the Department's full CN review process. Any potential applicant for a may submit a request to the Department at any time requesting that the Department issue a call for applications, and the Department will process that request as expeditiously as possible. By considering multiple CN applications under the competitive call process, the Department can most fairly consider what applicant is best equipped to provide the required services.
Next, the Commissioner acknowledged that the public had expressed concern with the inaccessibility of the substitute hospitals due to distance and lack of transportation. Accordingly, among the conditions to the grant of the CN, the Commissioner ordered that Solaris: (1) operate a primary care clinic either on site at the Muhlenberg campus or in conjunction with NHC-Plainfield; (2) maintain a SED on site at Muhlenberg for at least five years; (3) provide a no-cost continuous loop shuttle between the SED and JFK between *275 the hours of noon and 8:30 p.m., seven days per week; (4) provide a no-cost medical taxi service for patients to access scheduled non-emergent care services at JFK and Trinitas; and (5) provide round-the-clock no-cost ambulance service from the SED to area health care providers for patients in need of services not available at the SED. Additionally, Solaris was required to consult with New Jersey Transit and the transportation authorities in both Union and Middlesex Counties to "develop a patient and family transportation plan after performing an assessment, in consultation with CAG, to determine transportation needs to alternative inpatient and outpatient service providers."
In sum, the Commissioner determined that Solaris's decision to close Muhlenberg "appear[ed] sound and in the best interest of the county's health care delivery system." She observed that the primary objective of the closure was to maintain access at, and preserve the financial viability of JFK. In the Commissioner's view, "the discontinuance [of service at underperforming Muhlenberg] will contribute to the delivery of inpatient acute care services in the region and will not have a significant adverse impact on the remaining hospitals in Union County and the surrounding counties."
Solaris surrendered Muhlenberg's license on August 22, 2008, three weeks after the Commissioner issued her decision. It is not clear whether Muhlenberg was actually closed on that date or sometime before. Notably, Solaris had previously indicated to Muhlenberg employees that, following the grant of the requested CN, it would take six months to complete the "wind down" at the hospital. However, as set forth in its answers to Department completeness questions, Solaris actually began affirmatively implementing its "transition plan" to close Muhlenberg in May 2008. At that time, Solaris began moving Muhlenberg's inpatient and outpatient surgical services (which comprised the bulk of the hospital's services) to JFK. It anticipated completing this move during the summer of 2008, at which point it also planned to discontinue its obstetrical services.
Due to "staff resignations," Solaris also decided, in April 2008, to reduce its nineteen-bed ICU/CCU unit to eight beds, and its twenty-four bed in-patient psychiatric unit to sixteen beds. It advised the Department that it anticipated further reducing these units if it could not secure sufficient staffing. Notably, Solaris was never asked by the Department whether these "resignation-driven" reductions in service at Muhlenberg were actually the result, in whole or in part, of staff transfers to JFK, which transfers Solaris had promised to make available to as many Muhlenberg employees as possible.[3]
Plainfield and POP appealed the Commissioner's decision.[4] On September 9, 2008, the day after filing the notice of appeal, Plainfield and POP, among other applications, moved for a stay pending appeal. The Commissioner denied the stay concluding that Plainfield and POP had not shown a likelihood of success on the merits of their appeals since Solaris's CN application had complied with all statutory requirements. She disagreed that the closure of Muhlenberg would result in irreparable harm to the communities in its *276 service area. According to the Commissioner, "[d]iscontinuing services at Muhlenberg is a realistic assessment of the health care environment in Union County and the neighboring counties and the conditions [to the CN] provide access to health care services in the surrounding area." She noted that "while one may argue ... that the troubles at Muhlenberg could be attributed to many causes and culprits and may have been fixable had these troubles been addressed sooner, the inescapable fact remains that Solaris can no longer financially support Muhlenberg." The Commissioner further noted that staying her decision with its attendant conditions would potentially result in great harm to the public since Muhlenberg was already closed and "[i]t would not be possible or practical for Solaris to bring Muhlenberg back to the status of a full-service general hospital for purposes of ... appeal[]." Neither Plainfield nor POP sought relief from the denial of the stay.

II.
We first address Solaris' argument that the appeal is moot. The argument is premised on the denial of a stay and the resultant closure of the hospital facility. The hospital has been closed since mid-2008, facilities and services have been transferred, staff has been reassigned or dispersed and the task and cost of reopening would be considerable.
Short of reopening the hospital, a seemingly improbable circumstance and the result sought by Plainfield and POP here, Muhlenberg is closed and the decision sought here "`can have no practical effect'", Greenfield v. New Jersey Dep't of Corr., 382 N.J.Super. 254, 258, 888 A.2d 507 (App.Div.2006) (quoting New York Susquehanna & W. Ry. Corp. v. State Dep't of Treasury, Div. of Taxation, 6 N.J.Tax 575, 582 (1984), aff'd, 204 N.J.Super. 630, 499 A.2d 1037 (App.Div.1985)). Generally, "courts should not decide cases where a judgment cannot grant relief." Marjarum v. Twp. of Hamilton, 336 N.J.Super. 85, 92, 763 A.2d 796 (App.Div. 2000).
However, courts may decline to dismiss a matter on grounds of mootness, if the issue in the appeal is an important matter of public interest, Reilly v. AAA Mid-Atlantic Ins., 194 N.J. 474, 484, 946 A.2d 564 (2008), and capable of repetition, Joye v. Hunterdon Cent. Reg'l High School Bd. of Educ., 176 N.J. 568, 583, 826 A.2d 624 (2003). Because this appeal involves the closure of an urban hospital, the adequacy of the CN process governing such closures and consideration of additional conditions attached to the CN, we address the merits of the appeal.

III.

A.
Plainfield and POP contend that the Commissioner's decision to grant Solaris's application for a CN to close Muhlenberg was arbitrary and capricious, was not supported by sufficient evidence in the record, and violated the governing statutory and regulatory provisions.
We first consider our standard of review. We will not upset the ultimate determination of an administrative agency unless it is shown that it was arbitrary, capricious or unreasonable, that it violated legislative policies expressed or implied in the enabling legislation, or that the findings on which the decision was based were not supported by substantial, credible evidence. R & R Mktg., L.L.C. v. Brown-Forman Corp., 158 N.J. 170, 175, 729 A.2d 1 (1999). When an error in the factfinding of an administrative agency is alleged, our *277 review is limited to assessing whether sufficient credible evidence exists in the record below from which the findings made could reasonably have been drawn. Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). This review must encompass "the proofs as a whole" and must take into account "the agency's expertise where such expertise is a pertinent factor." Ibid.

B.
In 1971, New Jersey adopted the Health Care Facilities Planning Act (HCFPA), N.J.S.A. 26:2H-1 to -26, which established a regulatory system, under the supervision of the Commissioner of the Department of Health and Senior Services, intended to provide state residents with high quality health care services at a contained cost. N.J.S.A. 26:2H-1. Pursuant to this Act, health care facilities and services could not be expanded or instituted without the Commissioner's identification of a need and prior approval of the change through issuance of a CN. N.J.S.A. 26:2H-7. A CN was also mandated in the case of a voluntary closure of a general hospital. N.J.A.C. 8:33-3.2(b).
In 1998, the Legislature amended the CN statute to exempt certain services (but not the closure of a general hospital) from the CN requirement. Virtua, supra, 194 N.J. at 424, 945 A.2d 692; N.J.S.A. 26:2H-7a, -7c. Notably, though, it retained the requirement in areas where
a limitation of the proliferation of such services [through the CN requirement] may continue to be essential to protect the viability of the services as well as the providers now rendering them, to protect the role of such institutions as urban hospitals, whose importance to the Statewide health care system is indisputable, and to guard against the closing of important facilities and the transfer of services from facilities in a manner which is harmful to the public interest[.]
[N.J.S.A. 26:2H-6.1h (emphasis added).]
CN review was viewed as an "important protective tool in the management of the health of urban hospitals," Virtua, supra, 194 N.J. at 434, 945 A.2d 692.
In order to secure a CN, an applicant must demonstrate that
the action proposed in the application for such certificate is necessary to provide required health care in the area to be served, can be economically accomplished and maintained, will not have an adverse economic or financial impact on the delivery of health care services in the region or Statewide, and will contribute to the orderly development of adequate and effective health care services.
[N.J.S.A. 26:2H-8.]
In ruling upon a CN application, the Commissioner must also consider:
(a) the availability of facilities or services which may serve as alternatives or substitutes, (b) the need for special equipment and services in the area, (c) the possible economies and improvement in services to be anticipated from the operation of joint central services, (d) the adequacy of financial resources and sources of present and future revenues, (e) the availability of sufficient manpower in the several professional disciplines, and (f) such other factors as may be established by regulation.
[Ibid.]
According to N.J.A.C. 8:33-4.10(a), "[e]ach applicant for a [CN] shall show how the proposed project shall promote access to low income persons, racial and ethnic minorities, women, disabled persons, the elderly, and persons with HIV infections and other persons who are unable to obtain care."
*278 In Virtua, supra, 194 N.J. at 418, 945 A.2d 692, the Court reviewed the Commissioner's decision to approve Virtua-West's request to change the designation of its Voorhees hospital to a regional perinatal center (RPC), and for a CN to add four intensive and eight intermediate bassinets to its already approved complement of bassinets. This approval had been granted despite the objections of an existing RPC in Camden that claimed that there was no need for another RPC in the area, and that approval of Virtua-West's application for a suburban RPC would damage its own urban practice. Id. at 419, 945 A.2d 692. The objector asserted that, if it lost paying patients, it would be forced to discontinue services to indigent patients. Ibid. The objector also alleged that Virtua-West had already undermined its RPC through its existing policy of sending patients to hospitals outside of Camden, and often out of state. Ibid.
The Court reversed the Commissioner's[5] decision, concluding that she had improperly failed to analyze the impact that the CN would have on the urban hospitals likely to be affected by its grant. Id. at 434, 945 A.2d 692. The Court observed:
Here the Commissioner's comment on this important issue was, essentially, nothing more than an acceptance of Virtua's proffer that its beds will be filled by currently out-migrating patients, rather than from petitioners' patient population. In so ruling, the Commissioner accepted Virtua's claims that a new RPC was needed; that the purpose of its new designation was merely to reduce current transfers out of its system; and that it would not siphon off the objectors' patients. Those representations, which were strongly contested by the Camden objectors, were not subject to any apparent independent evaluation by the Commissioner, who simply did not discuss whether the addition of another perinatal center would diminish the number of paying patients willing to travel to Camden's hospitals. That, in turn, left unanswered the question of whether the Camden hospitals' ability to provide free or low-cost care to a large, indigent population was at risk.
The Commissioner's duty requires that she abide by her statutory and regulatory charges and examine all relevant evidence in each case. That must include the positions espoused by the objectors. Here, the Commissioner did not analyze, in any meaningful way, whether the grant to Virtua will have an adverse impact on the region's urban hospitals. That omission is a critical failing in a proceeding that has, as one of its pillars, avoidance of negative impacts on the delivery of health care services in the region.
As far as her decision reveals, the Commissioner uncritically accepted Virtua's position without examining and explaining her response to the positions advanced by the objectors. Virtua contends that petitioners' concerns are speculative. That may prove to be true, but on this record we cannot be sure. It may be that there was a basis for her to reach her conclusion to do so, but her decision gives little comfort that the required analysis took place.

Virtua also asserts that it cannot, and should not, be expected to make a showing in its CN application of the likely patient impact on petitioners. That, however, does not excuse the Commissioner from her obligation to satisfy the *279 legislative preference for a regulatory review that will serve as a check on undue harm to our valuable, and vulnerable, urban hospitals. The duty to guard against severe or pervasive negative impacts on urban hospitals when a CN for a new or enhanced service is under consideration lies squarely with the Commissioner.

[Id. at 435-36, 945 A.2d 692 (emphasis added).]
Although the CN granted by the Commissioner had never been stayed, the Court remanded the case for a full analysis and a complete explanation of the Commissioner's decision. Id. at 436, 945 A.2d 692.[6]
Plainfield and POP now contend that, in granting the requested CN to close Muhlenberg, the Commissioner disregarded her statutory duty to protect urban hospitals and chose instead to close a hospital entitled to special deference in favor of a suburban hospital serving a more affluent population. Specifically, POP and Plainfield argue that the Commissioner improperly failed to independently assess the needs of the indigent community in Muhlenberg's service area and to critically examine the legitimacy of the representations made by Solaris in its application. Plainfield and POP also assert that, by simply accepting Solaris's claims, the Commissioner essentially ceded her decision-making authority regarding this closures to Solaris.
In support of its contentions, POP notes that Solaris: (1) provided almost no information regarding its overall finances, preferring to present Muhlenberg as an isolated entity; (2) did not identify the alternatives it explored to closing the hospital and why those alternatives were rejected; (3) was never asked to respond to allegations that it depleted Muhlenberg's assets for the benefit of JFK; and (4) was never asked to provide particulars as to its efforts to sell Muhlenberg. Plainfield also notes that the Commissioner did not critically assess whether the drive times to substitute hospitals would negatively impact the affected community's access to care. POP further maintains that the Commissioner should have performed independent audits and community health need assessments, and should have examined whether closure would increase health disparities between white and other racial and ethnic minorities. POP takes special issue with the Commissioner's decision authorizing the immediate relinquishment of Muhlenberg's license, which it perceives as "calculated to increase the difficulties of reopening the Hospital."
Amicus curiae North Plainfield, among other arguments, notes that the Commissioner did not consider exactly which of the eight substitute hospitals Muhlenberg patients would actually be brought to, given their occupancy rates and EMS patterns, as well as the impact of farther facilities on existing emergency services.
We disagree with the broad attack on the Commissioner's assessment of the CN submission. Aside from the SHBP hearings, the record reveals that the Commissioner made cogent inquiries into the financial and service underpinnings of the application and according to her letter decision, secured an audited report for 2007 indicating that expenses exceeded revenues by $16.7 million. She noted that "Based on [Muhlenberg's] poor financial condition, the auditors have expressed doubts as to whether the [hospital] can *280 continue to operate." Contrary to the arguments raised by Plainfield and POP, the Commissioner did make inquiry of Solaris into the issues raised by them.[7]
The Commissioner alluded to the newly-enacted Health Care Stabilization Fund Act, N.J.S.A. 26:2H-18.74 to 18.78, effective August 29, 2008 (one month after her decision), and saw this as a resource for grant funding to meet community health needs.[8] Significantly, this Act established a fund "for the purpose of providing emergency grants to general hospitals and other licensed health care facilities to ensure continuation of access and availability of necessary health care services to residents in a community served by a hospital facing closure ... due to financial distress." N.J.S.A. 26:2H-18.75f. The Commissioner saw this fund as a resource for providing funding for the NHC-Plainfield, an integral component of the Commissioner's closing conditions.
The Commissioner made no mention of the January 2008 report issued by the Governor's Commission on Rationalizing Healthcare Services (the Reinhardt Report). That report focused, in part, on a number of concerns germane to this appeal. The first recognized the need to preserve urban hospitals, a need that was confirmed by the Court's decision in Virtua. The second was the deficiencies in the statutory review process and the use of a CN procedure to assess the viability of the closing of a hospital. And lastly, the report urged the need for a community health assessment. Plainfield and POP assert that the Commissioner should have adopted the principles advocated in the Reinhardt Report as they apply to Muhlenberg. Specifically, they criticize the Commissioner for failure to order a study to determine Muhlenberg's "essentiality."
Vital to any such mandate is a recognition that the Reinhardt Report is just that, a report, that must find its way into legislative consideration of a means of evaluating hospital closures. The Commissioner was not obligated to perform the recommended studies or adopt the report's recommendations, and while there appears to provide salutary prerequisites to a closure analysis, it was not a mandate at the time of consideration of this application.
The Reinhardt Report recommends a series of proposals to provide support for financially distressed hospitals, both essential and non-essential. These proposals, likewise, incorporate suggestions requiring legislative action and are beyond the options available to the Commissioner at the time of this application.
Additionally, the report urges that the CN process for closure should be reviewed and "streamlined and refocused to permit a more rational closure and realignment process than results from normal market forces and the bankruptcy procedure." New Jersey Commission on Rationalizing Health Care Resources, Final Report (Jan. 24, 2008), at 16, available at http://www.nj. gov/health/rhc/finalreport/index. shtml(Reinhardt Report). All parties agree that the present process is ill-suited to address the closure of the hospital, but *281 that, too, is beyond the authority of the Commissioner to correct.[9] Much of the chaos that would ensue from a bankruptcy proceeding was apparent here as Solaris moved to closures both before receipt of approval of the CN and soon thereafter. Many of the conditions imposed by the Commissioner were not yet in place. Both the Reinhardt Report and the facts of this closure suggest that the Commissioner and the Legislature should reexamine the CN procedure as a means of effectuating hospital closures especially when the closures involve protected urban hospitals.
Lastly, Plainfield and POP assert the need for a community health assessment to monitor the needs of those previously served by the now-closed Muhlenberg Hospital. Our review of the decision as well as the conditions imposed by the Commissioner satisfies us that the Commissioner was sensitive to the significant health-care needs of the greater Plainfield community. She imposed extraordinary conditions including continued, but limited, medical care at the Muhlenberg site, transportation programs to insure patient delivery to the hospitals now serving the community health needs as well as the formation of a Community Advisory Group to monitor the health needs of the community. She required bolstering of the services provided by the neighborhood health clinics. We cannot fault the imposition of these unique conditions nor the requirements imposed to ease the transition to other health care facilities.
The community outpouring in support of Muhlenberg Hospital not only demonstrated the significant impact that the institution had on generations of residents but the importance of health care in the lives of not only health care professionals, patients, past and present, but also ordinary citizens who recognized the import of a cherished resource. Yet the circumstances that brought these forces together in opposition also reflected the crises faced by the Commissioner in balancing the health of a failing institution with the need to insure that health care can be provided in a meaningful and orderly process.
We are satisfied that the Commissioner understood the conflict and properly determined that Muhlenberg Hospital could no longer sustain itself in the time of crisis.
Affirmed.
NOTES
[1] "Near the close of the year 1876, a railroad accident to a stranger, necessitating a serious surgical operation amid the bustle and distracting surroundings of the railway station, indicated the need of a hospital in Plainfield." Five months later, Muhlenberg Hospital was incorporated. Muhlenberg Hospital, Report for 1903-1904 (June 1904).
[2] In 2007, approximately 1100 babies were born at Muhlenberg.
[3] In fact, in her decision, the Commissioner noted that Solaris had retained at least 600 of Muhlenberg's more than 1000 employees, the vast majority of whom had been transferred to JFK.
[4] In a November 5, 2008 order, we consolidated the appeals and thereafter, granted leave to the Borough of North Plainfield to file an amicus brief.
[5] The then Deputy Commissioner, on behalf of a different Commissioner, actually signed the decision.
[6] We have reviewed the text of the then [Deputy] Commissioner's decision in Virtua and unlike the analysis here, it was conclusory with little of the analysis undertaken by the Commissioner on this application.
[7] Particularly noteworthy, one of the commenters on Solaris' application characterized the CN application as "the most informative and professionally presented CN application that we have reviewed over the past four years involving the sale and/or closure of an acute care hospital." Letter to John Calabria, Director, Certificate of Need and Acute Care Licensure Program, New Jersey Department of Health from Renée Steinhagen, Executive Director, New Jersey Appleseed, dated May 5, 2008.
[8] According to the Commissioner's decision, she had not yet promulgated the rules to "guide the application process."
[9] A careful reading of the CN application reveals that an inordinate number of questions are not applicable to the action proposed by the applicant.