NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2571-18T1

IN RE CERTIFICATE OF
NEED APPLICATION FOR
THE MEMORIAL HOSPITAL
OF SALEM COUNTY.

_____

APPROVED FOR PUBLICATION

July 2, 2020

APPELLATE DIVISION

Argued February 10, 2020 – Decided July 2, 2020

Before Judges Sabatino, Sumners and Natali.

On appeal from the New Jersey Department of Health,
Docket No. FR 18-0503-17-01.

Eric S. Aronson argued the cause for intervenor-
appellants Carneys Point Rehabilitation & Nursing
Center and Golden Rehabilitation & Nursing Center
(Greenberg Traurig, LLP, attorneys; Eric S. Aronson
and Matthew F. Bruno, on the briefs).

Patrick Jhoo, Deputy Attorney General, argued the
cause for respondent Department of Health (Gurbir S.
Grewal, Attorney General, attorney; Melissa H. Raksa,
Assistant Attorney General, of counsel; Patrick Jhoo,
on the brief).

Steven D. Gorelick argued the cause for respondent
Salem County Hospital Corp. (Garfunkel Wild, PC,
attorneys, join in the brief of respondent Department
of Health).

Barry J. Muller argued the cause for amicus curiae
Health Care Association of New Jersey (Fox
Rothschild LLP, attorneys; Jonathan D. Weiner, of

counsel and on the brief; Maureen E. Kerns and A. William Henkel, on the brief).

The opinion of the court was delivered by

NATALI, J.A.D.

Carneys Point Rehabilitation & Nursing Center (Carneys) and Golden Rehabilitation & Nursing Center (Golden) (collectively, intervenors) appeal a final decision of the Commissioner of the New Jersey Department of Health (the Commissioner) that granted Salem County Hospital Corporation's (SCHC) application for a certificate of need (CN) to transfer ownership of the Memorial Hospital of Salem County (Salem Hospital) to SCHC. In the context of that approval, the Commissioner also permitted SCHC to establish thirty long-term care (LTC) beds and twenty-six adult acute care psychiatric beds at the hospital.

We conclude that, despite the general deference owed to administrative agencies on appeal, the Commissioner failed to apply the relevant statutory factors to determine that there was a need for LTC beds in Salem County and he improperly awarded those beds without issuing a call notice in the New Jersey Register inviting competing applications. Further, even if the Commissioner's final decision can be interpreted as having determined a need for LTC beds in the area, the record contained insufficient support for such a finding. We also conclude that the Commissioner was required to conduct an

independent analysis of the actual need for a proposed service regardless of whether the transaction has an otherwise meritorious purpose, such as to support a hospital's financial viability. We agree, however, with the Commissioner's approval of the open adult acute care psychiatric beds to SCHC consistent with an unimplemented CN. Accordingly, we affirm in part and vacate and remand in part.

I.

Salem Hospital is a licensed general acute care hospital[1] located in Salem. It was formerly owned and operated by Salem Hospital Corporation, "an indirect wholly owned subsidiary of . . . Community Health Systems, Inc. (CHS)." While owned by CHS, the hospital was licensed to provide a bed capacity of 114 medical and surgical beds, as well as twelve adult Intensive Care Unit/Critical Care Unit beds, totaling 126 beds.

In May 2017, the Commissioner approved a CN to transfer ownership of Salem Hospital from CHS to Prime Healthcare Foundation-Salem Hospital, LLC (Prime) for $15 million. In support of his decision, the Commissioner noted Salem Hospital's "sustained operating losses and reduction in patient

---

[1] N.J.A.C. 8:33-1.3 defines "[g]eneral hospital" as "a hospital which maintains and operates organized facilities and services as approved by the Department for the diagnosis, treatment or care of persons suffering from acute illness, injury or deformity . . . ."

volume for several years" and that "the only option [besides] the transfer of ownership of Salem Hospital is the closure of the Hospital . . . ." Prime, however, cancelled the agreement and the transfer of ownership never occurred.

In addition, on November 17, 2017, the Commissioner approved a CN application by CHS which permitted it to implement twenty-six "open adult acute care psychiatric beds" at Salem Hospital. That CN, however, was never implemented.

On May 1, 2018, SCHC filed a CN application to transfer ownership of Salem Hospital. SCHC noted in its application that it sought to modify the licensed bed capacity at Salem Hospital to implement the November 17, 2017 award of twenty-six "[o]pen [a]dult [a]cute [p]sychiatric" beds. Further, as noted, SCHC sought to establish thirty LTC beds at the hospital. The Commissioner, however, did not issue a call notice regarding the need for LTC

beds in the area.[2]  In conjunction with its request to add the LTC beds, SCHC also sought to reduce the number of medical/surgical beds from 114 to 75.[3]

In support of its request for the thirty LTC beds, SCHC stated it sought "to meet the demand for post-acute services and to enhance the continuity of services at the current location."  It contended that there was a "minimal availability of [LTC] services in the immediate area of [Salem] Hospital," and that the additional beds would "represent[] an addition of only 5.8% of capacity in the Salem County service area and will have minimal impact on existing providers."  It also stated that the closest facility offering [LTC] services was "located more than [ten] miles from [Salem] Hospital."

Further, SCHC noted that because the application was "limited to a [t]ransfer of [o]wnership, there [would] be no reduction in competition," and that "any decrease in volume on any one provider will be minimal, at best." SCHC prepared a Market Share Data report and concluded that "since this

---

[2]  Pursuant to N.J.A.C.8:33-4.1(a), "[t]he Commissioner shall publish in the New Jersey Register . . . an anticipated schedule for receipt of [CN] applications subject to full review procedures," otherwise known as a call notice, in order to "invite [CN] applications" for a particular service in a given area.

[3]  SCHC's CN application provides that it would reduce the amount of medical/surgical beds to [sixty-five].  In SCHC's responses to completeness questions from the Department, however, it clarified that "all references to [sixty-five] medical/surgical beds were intended to be [seventy-five]."

application is limited to a [t]ransfer of [o]wnership, there will be no reduction in competition as a result of the project." That report included no analysis regarding any effect on providers in the service area specifically relating to SCHC's proposed increase in LTC beds. With regard to alternatives to the project, SCHC noted in its application that its only available alternative would be "the closure of [Salem] Hospital."

On November 8, 2018, the Department held a public hearing on SCHC's application. It considered written testimony on behalf of Carneys, Golden, and another facility objecting to approval of the portion of the application that requested the establishment of LTC beds. Those facilities argued that "SCHC's request to establish [thirty LTC] beds at [Salem] Hospital" was not "filed in accordance with governing statutes and regulations" and that SCHC was attempting to acquire a new license while characterizing the establishment of LTC beds as a "transfer" or "conversion." In this regard, Carneys, Golden, and the third facility contended that the portion of SCHC's application requesting LTC beds was "subject to the full review certificate of need process," which required a Department finding "that a need exists for such beds."

On December 6, 2018, the State Health Planning Board (Planning Board) held a hearing at which it voted to recommend that the Commissioner

approve SCHC's application. At that hearing, one Planning Board member questioned whether it was permissible "to grant [the LTC] beds without . . . a needs assessment or a call for beds in the area." In response, a representative of the Department stated:

> [T]he [D]epartment determined that the addition of the [thirty] beds, which is just over [five] percent . . . of the licensed beds in the area would have a minimal impact on the service area, so that would be more in keeping with . . . an expedited [CN] review . . . . We have received an objection. The [D]epartment considered the objection in making its determination . . . that it's only a minimal impact, and there's no impediment going forward.

At that hearing, the Planning Board also heard oral testimony both in favor of and against SCHC's CN application. The Human Resources Director at Golden testified "with certainty that the creation of [thirty] new [LTC] beds at the hospital will not create new jobs in the area as promised, but instead cause a transfer of current jobs from already well-established nursing facilit[ies]." Counsel for intervenors contended at that hearing that the Department's conclusion that "there will be a minimal impact on the service area is absolutely untrue" because the "[thirty] LTC beds, if they were built with Medicare subacute patients, represent about 36 percent of the Medicare business in [Salem] [C]ounty," and that market share would "devastate existing providers [in] the county."

The Chief Operating Officer of intervenors' parent company also stated that SCHC's estimate that the thirty LTC beds would comprise 5.8 percent of Salem County's total beds was "grossly wrong," instead explaining that the beds would comprise 30 percent of the market. He also stressed that if SCHC were "granted a 30 percent market share of Salem County's subacute market, the existing providers in that market [would] be devastated." Ultimately, three members of the Planning Board voted to recommend the application to the Commissioner, while one member voted against it.

One month later, on January 15, 2019, the Commissioner issued a sixteen-page final decision approving SCHC's CN application, including the thirty requested LTC beds and the unimplemented CN for psychiatric beds. In making his decision, the Commissioner "considered the CN application, responses to completeness questions, the public hearing transcript, written comments and exhibits, Department staff recommendations, and the [Planning Board] recommendations."

The Commissioner determined that the November 17, 2017 CN approval letter which awarded the implementation of twenty-six psychiatric beds to CHS would be transferred to SCHC as part of the transfer of ownership. In doing so, he noted that the November 17, 2017 CN approval letter "addressed

the requirements of N.J.S.A. 26:2H-8(a) [to] (f) [with] regard to the psychiatric beds and that analysis is incorporated herein by reference."

With respect to the LTC beds, the Commissioner concluded that "the addition of [thirty] LTC beds will have a minimal impact on the health care system as a whole and will contribute to the financial viability of Salem Hospital." The Commissioner relied upon SCHC's testimony before the Planning Board that:

> if this approval does not contain the transfer of ownership, the psychiatric beds, and the LTC beds, then the continued operation of Salem Hospital would be in question, and the closure of the hospital would have a greater negative impact on the area's healthcare system as a whole than the addition of the [thirty] LTC beds would.

The Commissioner also found that the only alternative to the award of thirty LTC beds would be the "closure of Salem Hospital," and that "[t]he transfer of ownership and licensing of the psychiatric and LTC beds is the least disruptive alternative to maintaining the current level of care and services in the area." Moreover, he found that "[t]he addition of [thirty] LTC beds represent an addition of 5.3 [percent] of the capacity in the Salem County service area and will have a minimal impact on the health care system as a whole." Thus, he stated, "the minimal impact coupled with the need for this

hospital to have these beds in order to maintain the operations of the hospital necessitates the granting of these LTC beds to Salem."

Finally, the Commissioner concluded that under N.J.A.C. 8:33-4.9(a),[4] were he to deny the application, there would be an adverse effect on patients in the Salem community because:

> the transfer of ownership . . . along with the transfer of the psychiatric beds [and] the award of the [thirty] LTC beds appear to be the only manner in which Salem Hospital may remain in operation. This approval is the only manner in which the current level of care and services may be maintained in the area. This approval will preserve access to health care services for the Salem community, including the medically indigent and medically underserved populations.

The same day, intervenors filed this appeal. One month later, the Department denied intervenors' request to stay the implementation of the award of the LTC beds.

On appeal, intervenors argue the Commissioner's final decision was contrary to the requirements for granting CN applications detailed in the Health Care Facilities Planning Act (Planning Act), N.J.S.A. 26:2H-8, and the relevant administrative regulations and therefore constituted an ultra vires

---

[4] N.J.A.C. 8:33-4.9(a) provides in part that "[n]o [CN] shall be issued unless the action proposed in the application . . . will not have an adverse impact on access to health care services in the region or Statewide . . . ."

action as he: 1) failed to issue a call notice before approving SCHC's request to convert medical surgical beds to LTC beds; 2) failed to adequately support his approval of SCHC's request for LTC beds; and 3) erred by approving the transfer of an unimplemented CN for psychiatric beds along with the transfer of ownership.

## II.

Our review of an agency's decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011) (citing Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). A reviewing court "should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008) (citing In re Herrmann, 192 N.J. 19, 28 (2007)); see also Bergen Pines Cty. Hosp. v. N.J. Dep't of Human Servs., 96 N.J. 456, 477 (1984).

As noted, intervenors initially argue that the final decision should be vacated because the Commissioner failed to comply with CN regulations by approving SCHC's request to add thirty LTC beds without subjecting it to the full review process outlined in N.J.A.C. 8:33-4.1(a). Specifically, they

contend that the Commissioner was required to publish a call notice in the New Jersey Register to invite competing applications for LTC beds, and by failing to do so, committed an ultra vires act that "deprived other providers . . . of the opportunity to similarly apply to provide [LTC] services at Salem Hospital." They also maintain that there was insufficient support in the record to indicate that there was a need to provide LTC beds in the area and that the process employed by the Commissioner "runs afoul of [his] statutory obligations to first determine that there is a need for such services." We agree.

Pursuant to the Planning Act, and specifically N.J.S.A. 26:2H-7, no health care facility, including a hospital, may construct new facilities, expand existing ones, or initiate a new health care service, unless a CN has been applied for by the facility and granted by the Commissioner. The ultimate policy goals of the Planning Act are to "protect and promote the health of the inhabitants of the State" and to "guard against the closing of important institutions and the transfer of services from facilities in a manner that is harmful to the public interest." N.J.A.C. 8:33-1.2(a). Further, the Planning Act states that the Commissioner shall not grant a CN unless the proposal:

> is necessary to provide required health care in the area
> to be served, can be economically accomplished and
> maintained, will not have an adverse economic or
> financial impact on the delivery of health care services
> in the region or [s]tatewide, and will contribute to the

12

orderly development of adequate and effective health care services.

[N.J.S.A. 26:2H-8.]

In determining whether to grant a CN, the Commissioner shall consider:

(a) the availability of facilities or services which may serve as alternatives or substitutes, (b) the need for special equipment and services in the area, (c) the possible economies and improvement in services to be anticipated from the operation of joint central services, (d) the adequacy of financial resources and sources of present and future revenues, (e) the availability of sufficient manpower in the several professional disciplines, and (f) such other factors as may be established by regulation.

[Ibid.; see also N.J.A.C. 8:33-4.9(a)(1)-(5); N.J.A.C. 8:33-4.10(b).]

The application and review process regarding CNs is further outlined in N.J.A.C. 8:33-1.1 to -6.2. In this regard, the applicable regulations provide for either a full or expedited review of a CN application. N.J.A.C. 8:33-4.1(a) to (b). As defined by N.J.A.C. 8:33-1.3, a full review includes "the review of an application by the . . . Planning Board, as well as the Department," while an expedited review "means the review by the Department of a [CN] application meeting certain specified criteria" without a Planning Board review.

As noted, where the Commissioner determines that a need exists for a particular service in a given area, he is required to publish a call notice in the New Jersey Register in order to "invite [CN] applications . . . ." N.J.A.C.

8:33-4.1(a). Any such call notice must "identify the needed service(s), proposed geographic area(s) to be served, the date the application is due, and the date the application is deemed complete for processing." Ibid. Call notices are required only for CN applications subject to full review. Compare N.J.A.C. 8:33-4.1(a) with N.J.A.C. 8:33-4.1(b).

Once an applicant submits an application subject to full review, the Department reviews it for completion. N.J.A.C. 8:33-4.5(a). It submits completed applications along with its analysis and recommendations to the Planning Board. Ibid. The Planning Board then conducts a public hearing to consider the application. N.J.A.C. 8:33-4.13. Following that hearing, the Planning Board provides the Commissioner with its recommendations. N.J.A.C. 8:33-4.13(c). Finally, the Commissioner issues a final agency decision that details its factual findings and reasoning. N.J.A.C. 8:33-4.15(a).

Conversely, an expedited review requires neither a call notice nor a review by the Planning Board. N.J.A.C. 8:33-4.1(b). The Commissioner may expedite review of the types of CN applications outlined in N.J.A.C. 8:33-5.1(a), as well as in "[e]mergency situations which demand rapid action," N.J.A.C. 8:33-5.1(b)(1), or when it determines that "the project has minimal impact on the health care system as a whole," N.J.A.C. 8:33-5.1(b)(2). The expedited review process still requires "review of a [CN] application by the

Department" against the statutory factors outlined in N.J.S.A. 26:2H-8 with "a decision . . . by the Commissioner no later than [ninety] days" after the end of the review cycle.  N.J.A.C. 8:33-4.1(b).

Generally, "[a]ny increase in the number of licensed beds by licensure and/or health planning category" requires a full review.  N.J.A.C. 8:33-3.4(a)(1).  In this regard, "[c]onversions of licensed beds to other uses shall be treated as increases in the number of beds by licensure or health planning category" and are also subject to full review.  N.J.A.C. 8:33-3.4(a)(2).  However, as noted, where the Commissioner determines, consistent with N.J.A.C. 8:33-5.1, that a project will have a "minimal impact on the health care system as a whole," the project may be reviewed on an expedited basis.

Where an agency commits an act that violates its enabling act or regulations, that act is ultra vires, meaning that it is "void and may not be ratified."  Port Liberte II Condo. Ass'n v. New Liberty Residential Urban Renewal Co., 435 N.J. Super. 51, 65 (App. Div. 2014) (quoting Grimes v. City of East Orange, 288 N.J. Super. 275, 279 (App. Div. 1996)); see also Comms. Workers of Am., AFL-CIO v. N.J. Civil Serv. Comm'n, 234 N.J. 483, 534 (2018).  "While findings of ultra vires actions are disfavored, '[o]ur role is to enforce the will of the Legislature' because '[s]tatutes cannot be amended by administrative fiat.'"  In re Agric., Aquacultural, & Horticultural Water Usage

Certification Rules, 410 N.J. Super. 209, 223 (App. Div. 2009) (alterations in original) (citations omitted).

In considering whether the Commissioner has exceeded his authority or acted arbitrarily in approving an application, we are guided by the holding in Virtua-West. In that case, our Supreme Court vacated and remanded the Commissioner's decision to grant a CN to an applicant who "asked for a change in classification" of its Voorhees hospital which would permit it to provide "maternal and child health services . . . [for] 'high risk mothers and neonates.'" Virtua-West, 194 N.J. at 418, 434. In support of its decision, the Court determined that the Commissioner failed to analyze "the impact that this CN will have on the urban hospitals likely to be affected by its grant." Id. at 434. In this regard, the Court described a "long-standing legislative objective to protect urban hospitals" and noted that CN review is "an important protective tool in the management of the health of urban hospitals." Id. at 434-35; N.J.S.A. 26:2H-6.1(h).

Further, in determining that the Commissioner "did not analyze, in any meaningful way," whether the grant would have "an adverse impact on the region's urban hospitals," the Court found that omission to constitute "a critical failing in a proceeding that has, as one of its pillars, avoidance of negative impacts on the delivery of health care services in the region." Virtua-West,

194 N.J. at 436. The Court emphasized that its role was not to reexamine the strength of the application, but to search the final agency decision for arbitrariness:

> As far as her decision reveals, the Commissioner uncritically accepted Virtua's position without examining and explaining her response to the positions advanced by the objectors. Virtua contends that petitioners' concerns are speculative. That may prove to be true, but on this record we cannot be sure. It may be that there was a basis for her to reach her conclusion to do so, but her decision gives little comfort that the required analysis took place.
>
> [Ibid.]

Moreover, when reviewing a final decision, we expect that the Commissioner will "state the basis of [the] decision with clarity; and, with sufficiency, to articulate the factual determinations and legal standards that inform the action taken." In re Certificate of Need Application of Arnold Walter Nursing Home, 277 N.J. Super. 472, 479 (App. Div. 1994) (citing Holy Name Hosp. v. N.J. Health Care Admin. Bd., 258 N.J. Super. 411, 415-16 (App. Div. 1992)). We cannot properly review a case "in the absence of a particularized and detailed articulation of the Commissioner's assessment of the salient features of each application, how the various applications compare to each other, and how each serves or fails to serve public health needs as

17

expressed by the Legislature and in effecting regulations."  Id. at 483; see also Application of Holy Name Hosp., 301 N.J. Super. 282, 292 (App. Div. 1997).

Here, in SCHC's application for transfer of ownership, it sought to "modify [its] licensed bed capacity" by decreasing the amount of medical/surgical beds and increasing the amount of LTC beds.  By seeking to convert medical/surgical beds to LTC beds, SCHC's May 2018 application functioned as an "increase in the number of licensed beds by licensure" pursuant to N.J.A.C. 8:33-3.4(a)(1).  Accordingly, the Commissioner was required to consider that request specifically and in the context of a full review consistent with the Planning Act and applicable regulations.[5]

Even if the Commissioner was authorized to proceed in the manner in which he did, we also conclude that the limited findings made by the Commissioner regarding the LTC beds under N.J.S.A. 26:2H-8 were not supported by substantial credible evidence in the record.  In his decision, the

---

[5] We note that in Virtua-West, the Court concluded that despite the lack of a specific call notice for applications for regional perinatal centers, other providers received sufficient notice that such applications would be accepted under a general call for "services encompassed under the maternal-and-child-health-need category."  194 N.J. at 429-30.  Here, however, there is no indication in the record that any such general notice existed which would have notified all interested providers that applications for an increase in LTC beds in the area would have been accepted for processing.  And, even if intervenors' participation could reflect a lack of prejudice as to their interests, as we have concluded, the Commissioner failed to establish a need for LTC beds with proper support in the record.

Commissioner conducted an analysis of N.J.S.A. 26:2H-8(a) through (f) with regard to the transfer of ownership of the hospital. This analysis focused on the transfer of ownership and stressed that "continuation of the operating losses at Salem Hospital could put the future of Salem Hospital at risk and lead to [its] closure." The Commissioner also noted that "[t]he applicant's plan to bring the hospital into good financial health includes the addition of the [thirty] LTC beds and without the beds the hospital's financial forecast would not be sustainable thereby placing the continuing operation of the hospital in jeopardy."

We acknowledge that couched within the Commissioner's analysis were spare references to the merits of granting SCHC's request for the LTC beds, including that the application would be approved because "[t]he transfer of ownership and licensing of the psychiatric and LTC beds is the least disruptive alternative to maintaining the current level of care and services in the area" and that "[t]he addition of [thirty] LTC beds represent an addition of 5.3 [percent] of the capacity in the Salem County service area and will have a minimum impact on the healthcare system as a whole." Nevertheless, the Commissioner clearly considered SCHC's application in the general context of the financial viability of Salem Hospital and not with the necessary focus and analysis regarding the actual need for LTC beds in the area.

For example, although the Commissioner found that there would be a 5.3 percent increase in LTC beds in the area by dividing 30 beds into the 513 LTC beds at the other four local facilities, we note that this figure represents, at best, only an increase in capacity. It does not address whether an actual need exists for those increased LTC beds. In this regard, the only evidence in the record establishing the extent the LTC beds at those facilities are actually filled was provided by intervenors, who pointed to data indicating that the occupancy rate in Salem County in 2017 was 83.1 percent and "today's overall occupancy rate" was less than 80 percent.

Likewise, the Commissioner stated that besides Inspira Medical Center-Elmer, "all other New Jersey hospitals in the area are located greater than [sixteen] miles from Salem Hospital." However, written testimony before the Planning Board indicated that Golden "is located about 0.5 miles from [Salem] Hospital," Carneys "is located 11.6 miles from [Salem] Hospital," and another LTC facility "is located 7.7 miles from [Salem] Hospital." As such, we conclude the Commissioner did not engage in the necessary analysis of the N.J.S.A. 26:2H-8 factors and instead analyzed the application substantively in the context of the financial viability of Salem Hospital. While this may have been an altruistic goal, it did not address completely the appropriate standard, which is whether granting SCHC's request for LTC beds would be necessary to

20

supply "required health care in the area to be served, can be economically accomplished and maintained, will not have an adverse economic or financial impact on the delivery of health care services . . ., and will contribute to the orderly development of adequate and effective health care services." N.J.S.A. 26:2H-8.

Moreover, the Commissioner improperly failed to address substantively with support in the record, the positions of the objectors in making his decision. Instead, as in Virtua-West, the Commissioner appears to have "uncritically accepted" the position of SCHC "without examining and explaining [his] response to the positions advanced by [intervenors]." 194 N.J. at 436; see also Holy Name Hosp., 258 N.J. Super. at 416 (reversing the denial of a CN application where the Commissioner's decision appeared to be "effectively determined at the State Staff level and was not subjected to any critical judgment thereafter").

By way of example, as noted, the Commissioner found that the addition of thirty LTC beds would have a "minimum impact" on providers in the area because "[t]he addition of [thirty] LTC beds represent an addition of 5.3% of the capacity in the Salem County service area." However, at the Planning Board meeting, one member was "disturbed" by an existing provider's suggestion that SCHC "could basically put them out of business . . . by . . .

taking those [LTC] beds." Further, representatives of intervenors contended that if SCHC received thirty LTC beds, it would "devastate existing providers to the county." Not only did the Commissioner note in a conclusory fashion that there would be a "minimum impact" on existing providers without considering the positions of intervenors, it appears that his words are "those of the . . . investigator who had initially recommended" approval of SCHC's application. Holy Name Hosp., 258 N.J. Super. at 416.

Further, according to the intervenors and amicus, limited personnel resources and federal funding comprising the bulk of the payments for LTC patients' care will be funneled from current underutilized facilities which will result in not more or better care, but worse because it could "reduc[e] existing providers' ability to provide services," particularly to the indigent population. In this regard, intervenors' written testimony before the Planning Board stated that based on SCHC's projected 95 percent occupancy of LTC beds, a thirty-bed increase at Salem Hospital would transfer 36 percent of Salem County's Medicare population from existing providers. And, we note that this diversion of services would be from financially viable entities currently providing the necessary LTC beds to a hospital in financial distress - as conceded by SCHC's own submissions and the Commissioner's findings - with an uncertain future even with an increase in LTC beds. On this point, in its CN application SCHC

A-2571-18T1

disclosed historic operating losses of approximately $19 million in 2016 and $22 million in 2017. While it also estimated total net operating revenues from 2019 through 2022 of approximately $70 million per year, it projected only a total income of approximately $200,000 per year as a result of the LTC beds.

We also reject the Commissioner's argument that to the extent a separate inquiry for an increase in LTC beds was required, the Commissioner made the necessary findings to review that request on an expedited basis because he "determined that [the additional LTC beds] would have a minimal impact on the health care system as a whole." First and foremost, it is clear from the record that the Department proceeded with a full review, as opposed to an expedited review, of SCHC's application to acquire ownership of Salem Hospital. In this regard, the Commissioner submitted SCHC's application to the Planning Board and the Planning Board held a public hearing on the application in order to issue recommendations to the Commissioner, a process exclusive to applications subject to a full review. See N.J.A.C. 8:33-4.1(a)-(b). And, neither party disputes that SCHC did not seek expedited review of any portion of its CN.[6]

---

[6] Here, the concept of an expedited review was first raised in the Department's staff recommendations, in which it noted "SCHC could have separately applied for these LTC beds as an expedited review . . . claiming minimal impact on the healthcare system as a whole," but that "for transparency purposes these LTC
(continued)

As SCHC made no application for review of its CN application on an expedited basis and the Commissioner clearly considered the application under the full review process, we need not address whether a hypothetical CN application for LTC beds could proceed on an expedited basis. Even were we to assume, however, that an increase in LTC beds could proceed without a call and the necessary input from all interested parties to assess the need for those beds, and were we to further indulge the argument that the post hoc findings by the Commissioner satisfied the requirements of N.J.A.C. 8:33-5.1(b)(2), for the reasons detailed, supra pages 18 to 23, the Commissioner's findings on the need for LTC beds under N.J.S.A. 26:2H-8 were not supported by the record in any event.

Finally, we observe that the robust review process contemplated by N.J.A.C. 8:33-1.1 to -6.2 and the Planning Act has numerous substantive purposes including to limit the "proliferation of certain health care services to preserve the viability of existing providers, . . . guard[ing] against the closing

(continued)
beds were added to this CN to indicate to the community all planned uses" of Salem Hospital. Similarly, at the December 6, 2018 Planning Board meeting, one member noted that the steps taken to that point with regard to the LTC beds were "more in keeping with . . . an expedited [CN] review." Despite these comments, it is clear that an expedited review was not the process employed and that SCHC's CN application to transfer ownership of Salem Hospital underwent a full review.

of important institutions[,] and . . . transfer[ring] of services from facilities in a manner that is harmful to the public interest." N.J.A.C. 8:33-1.2(a). Here, despite the Commissioner's apparent goal to "save" Salem Hospital, noble as it may have been, his final decision did not adequately address the aforementioned legislative objectives or the intervenors' objections. Accordingly, we vacate the Commissioner's January 15, 2019 final agency decision to the extent that it granted SCHC an increase in LTC beds and remand for further proceedings consistent with the Planning Act.

III.

Finally, intervenors argue that the Commissioner erred in approving the transfer of the twenty-six psychiatric beds from the unimplemented November 2017 CN awarded to CHS. Specifically, they contend that N.J.A.C. 8:33-3.3(j) prohibits "the transfer of unimplemented certificates of need," and that the Commissioner's approval was not based on any exception enumerated in N.J.A.C. 8:33-3.3(h)(1) to (6). In response, the Commissioner maintains that intervenors lack standing to challenge his award of psychiatric beds to SCHC because that award does not affect intervenors' interests.

Generally, where an applicant seeks to acquire an unimplemented CN, "the transfer of unimplemented [CNs] is prohibited [and] [p]roceeding with any such transfer shall nullify the [CN] and preclude licensure as a health care

25

facility." N.J.A.C. 8:33-3.3(j). N.J.A.C. 8:33-3.3(k) provides that in the Department's discretion, "the [CN] process for transfer of ownership may be allowed to proceed on an unimplemented [CN] if the types of changes set forth at [subsection] (h)(1) through (6) above apply,"[7] and that "[a]pplicants for transfers of unimplemented [CNs] shall demonstrate in the application that the transfer will not adversely affect the financial feasibility of the project."

However, N.J.A.C. 8:33-3.3(m), which governs the transfer of unimplemented CN approvals in the specific context of a transfer of ownership of a health care facility, provides:

> If the facility being transferred has any partially implemented or unimplemented [CN] approvals, an application for a license to own and/or operate the facility by the new owner will not be accepted . . . unless the current owner/operator surrenders to the Department the unimplemented [CN] approvals. The Commissioner may waive this requirement, based on a determination that the project has been substantially

---

[7] N.J.A.C. 8:33-3.3(h) provides that a CN is not required for various types of changes by health care facilities, including where: 1) "less than [ten] percent of the outstanding stock" is purchased or sold; 2) a transaction occurs involving "purchase or sale of limited partnership interests in a limited partnership," 3) there exists "[a] change in the membership of a nonprofit corporation . . . and there is no purchase or sale of assets,"; 4) there exists "[a] change in ownership which does not involve acquisition of an ownership interest by a new principal"; 5) there is a "death of a principal in a health care facility"; and 6) there is "[a] transfer, which involves a change in the controlling legal entity, but not in individuals with ownership interests," such as a merger, consolidation, or "[a] change in the type of organizational entity owning the facility only."

completed and that completion of the project is in the public interest, consistent with the principles set forth at N.J.A.C. 8:33-1.2.

Here, in the Planning Board's statement of reasons for recommending that the Commissioner approve SCHC's CN application for transfer of ownership, it stated that it relied upon Department staff's assertion "that approval to transfer the [twenty-six] open psychiatric beds is a project that has been substantially completed and that completion of the project is in the public interest." Further, the Commissioner relied upon the November 7, 2017 CN approval to determine that it was "not only appropriate but necessary to transfer the unimplemented CN to [SCHC] to ensure that the need for these beds is met." In support of his decision, the Commissioner considered the "availability of facilities or services which may serve as alternatives or substitutes," pursuant to N.J.S.A. 26:2H-8(a), and determined that "[t]he transfer of ownership and licensing of the psychiatric . . . beds is the least disruptive alternative to maintaining the current level of care and services in the area."

In intervenors' reply brief, they argue that the Commissioner did not make an explicit finding as to whether the unimplemented November 7, 2017 CN for psychiatric beds has been "substantially completed" pursuant to N.J.A.C. 8:33-3.3(m). We initially note that because intervenors did not raise

this argument below, we consider any such contention waived. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Further, intervenors improperly raised the lack of substantial completion argument for the first time on reply. See Borough of Berlin v. Remington Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001) ("Raising an issue for the first time in a reply brief is improper.") (citing State v. Smith, 55 N.J. 476, 488 (1970)).

As to the merits of intervenors' contention, we note that the Commissioner incorporated the reasoning of the November 7, 2017 CN by reference and conditioned his approval on SCHC's compliance "with all conditions related to the [twenty-six] psychiatric beds as stated in the CN approval letter dated November 17, 2017." At the December 6, 2018 hearing, the Department's Health Systems Specialist read the Department's findings into the record, including that "approval to transfer the [twenty-six] open psychiatric beds is a project that has been substantially completed and that completion of the project is in the public interest." There was never a challenge to that finding by any entity in the administrative proceeding, and on appeal intervenors fail to cite any record support to challenge that specific finding or the Commissioner's decision to award the November 7, 2017 CN, generally. As a result of our decision, we need not address the Commissioner's

argument that intervenors do not possess standing to challenge the November 7, 2017 CN as they do not provide psychiatric beds at their facilities.

IV.

In sum, we affirm the Commissioner's January 15, 2019 final agency decision transferring the unimplemented November 7, 2017 CN for twenty-six psychiatric beds to SCHC. We vacate, however, that final agency decision to the extent that it granted SCHC an increase in LTC beds, and we remand for further proceedings consistent with our opinion and the Planning Act.

As in Virtua-West, "[w]e recognize that the CN has already been issued and never has been stayed. Nonetheless, in order to fulfill the statutory, and salutary, purposes of the CN system, we must remand this case to the Commissioner for a full analysis and a complete explanation of [his] decision." 194 N.J. at 436. While we acknowledge that on remand, the Commissioner may again award the LTC beds to SCHC, his conclusion "must be reached through a more careful examination of the record and explication for the determination that is reached." Ibid. We express no opinion on the outcome of any future administrative proceedings.

Affirmed in part and vacated and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2571-18T1